**DOW CHEMICAL COMPANY and Shell Oil Company, Petitioners,**

v.

**Domingo CASTRO ALFARO et al., Respondents.**

No. C–7743.

Supreme Court of Texas.

March 28, 1990.

Rehearing Overruled May 2, 1990.

Joe R. Greenhill, Austin, F. Walter Conrad and Michael Samford, Houston, Russell J. Weintraub, Austin, Burt Ballanfant, Houston, for petitioners.

Charles S. Siegel, Dallas, for respondents.

OPINION

RAY, Justice.

At issue in this cause is whether the statutory right to enforce a personal injury or wrongful death claim in the Texas courts precludes a trial court from dismissing the claim on the ground of forum non conveniens. The court of appeals held that Texas courts lack the authority to dismiss on the grounds of forum non conveniens. 751 S.W.2d 208. Because we conclude that the legislature has statutorily abolished the doctrine of forum non conveniens in suits brought under section 71.031 of the Texas Civil Practice and Remedies Code, we affirm the judgment of the court of appeals.

Domingo Castro Alfaro, a Costa Rican resident and employee of the Standard Fruit Company, and eighty-one other Costa Rican employees and their wives brought suit against Dow Chemical Company and Shell Oil Company. The employees claim that they suffered personal injuries as a result of exposure to dibromochloropropane (DBCP), a pesticide manufactured by Dow and Shell, which was allegedly furnished to Standard Fruit. The employees exposed to DBCP allegedly suffered several medical problems, including sterility.

Alfaro sued Dow and Shell in Harris County district court in April 1984. The amended petition alleged that the court had jurisdiction under article 4678 of the Revised Statutes.[1] Following an unsuccessful attempt to remove the suit to federal court, Dow and Shell contested the jurisdiction of the trial court almost three years after the filing of the suit, and contended in the alternative that the case should be dismissed under the doctrine of forum non conveniens. Despite a finding of jurisdiction, the trial court dismissed the case on the ground of forum non conveniens.

Section 71.031 of the Civil Practice and Remedies Code provides:

(a) An action for damages for the death or personal injury of a citizen of this state, of the United States, or of a foreign country may be enforced in the courts of this state, although the wrongful act, neglect, or default causing the death or injury takes place in a foreign state or country, if:

(1) a law of the foreign state or country or of this state gives a right to maintain an action for damages for the death or injury;

(2) the action is begun in this state within the time provided by the laws of this state for beginning the action; and

(3) in the case of a citizen of a foreign country, the country has equal treaty rights with the United States on behalf of its citizens.[2]

(b) All matters pertaining to procedure in the prosecution or maintenance of the action in the courts of this state are governed by the law of this state.

(c) The court shall apply the rules of substantive law that are appropriate under the facts of the case.

Tex.Civ.Prac. & Rem.Code Ann. § 71.031 (Vernon 1986). At issue is whether the language "may be enforced in the courts of this state" of Section 71.031(a) permits a trial court to relinquish jurisdiction under the doctrine of forum non conveniens.

The statutory predecessors of Section 71.031 have existed since 1913. The original law states "[t]hat whenever the death or personal injury of a citizen of this State or of a country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by a wrongful act, neglect or default ... such right of action may be enforced ... in the courts of this State...." Act of Apr. 8, 1913, ch. 161, 33d Leg., 1913 Tex.Gen.Laws 338, 338–39, *repealed by* Revised Statutes, § 2, 39th Leg., 1925 Tex.Rev.Civ.Stat. 2419. Another act was passed in 1917 to expand the right of action to citizens of the United States. Act of Mar. 30, 1917, ch. 156, 35th Leg., 1917 Tex.Gen.Laws 365, *repealed by* Revised Statutes, § 2, 39th Leg., 1925 Tex.

---

1. Although article 4678 was in effect at the time suit was originally brought, this cause is governed by section 71.031 of the Civil Practice and Remedies Code because no substantive change was intended by the legislature's recodification. *See* Tex.Civ.Prac. & Rem.Code Ann. § 1.001(a) (Vernon Supp.1989).

2. The United States and Costa Rica agreed to the following:

The citizens of the high contracting parties shall reciprocally receive and enjoy full and perfect protection for their persons and property, and shall have free and open access to the courts of justice in the said countries respectively, for the prosecution and defense of their just rights; and they shall be at liberty to employ, in all cases, the advocates, attorneys, or agents of whatever description, whom they may think proper, and they shall enjoy in this respect the same rights and privileges therein as native citizens.

Treaty of Friendship, Commerce, and Navigation, July 10, 1851, United States–Costa Rica, art. VII, para. 2, 10 Stat. 916, 920, T.S. No. 62. Subsection (a)(3) requires the existence of similar treaty provisions before an action by a citizen of a foreign country may be maintained under Section 71.031.

Rev.Civ.Stat. 2419. The statute was codified in 1925 and amended in 1975. Revised Statutes, sec. 1, art. 4678, 35th Leg., 1925 Tex.Rev.Civ.Stat. 2, 1283, *amended by* Act of May 29, 1975, ch. 530, § 2, 64th Leg., 1975 Tex.Gen.Laws 1381, 1382, *repealed by* Civil Practice and Remedies Code, ch. 959, § 9, 69th Leg., 1985 Tex.Gen.Laws 3242, 3322. The 1975 amendment allowed Texas courts to apply the law of the state of Texas in actions arising under old article 4678. The amendment responded to this court's decision in *Marmon v. Mustang Aviation,* which held that the doctrine of lex loci delicti applied to old article 4678. *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182 (Tex.1968); *see Gutierrez v. Collins,* 583 S.W.2d 312, 317–18 n. 3 (Tex. 1979).

Dow and Shell argued before this Court that the legislature did not intend to make section 71.031 a guarantee of an absolute right to enforce a suit in Texas brought under that provision. In his dissent, Justice Gonzalez agrees, concluding that the legislature could not have intended to preclude application of forum non conveniens to suits brought under the statute because *"[f]orum non conveniens* did not arrive upon the judicial landscape of this state until after the predecessors to section 71.-031 were enacted." 786 S.W.2d 691. This conclusion is false. The doctrine of forum non conveniens appeared in Texas well before the enactment of article 4678 by the legislature in 1913.

## I.

The doctrine of *forum non conveniens* arose from the doctrine of *forum non competens* in Scottish cases. *See, e.g., Vernor v. Elvies,* 6 Dict. of Dec. 4788 (1610); *see also* Barrett, *The Doctrine of Forum Non Conveniens,* 35 Calif.L.Rev. 380, 386–87 & n. 35 (1947). The Scottish courts recognized that the plea of *forum non competens* applied when to hear the case was not expedient for the administration of justice. In *Longworth v. Hope,* 3 Sess.Cas. (3d ser.) 1049, 1053 (1865), the court stated:

> The next question is the question of *forum non competens.* Now the plea

usually thus expressed does not mean that the forum is one in which it is wholly incompetent to deal with the question. The plea has received a wide signification, and is frequently stated in reference to cases in which the Court may consider it more proper for the ends of justice that the parties should seek their remedy in another forum.

*Id.; see* Barrett, *supra,* at 387, n. 35. By the end of the nineteenth century, English courts had "accepted the doctrine of *forum non conveniens* as a means of preventing abuse of the court's process when the plaintiff's choice of forum is vexatious and works unnecessary hardship on the defendant." Barrett, *supra,* at 388.

In 1929, Paxton Blair, a Wall Street lawyer, brought the term "forum non conveniens" into American law with his article entitled, *The Doctrine of Forum Non Conveniens in Anglo–American Law. See generally,* Blair, *The Doctrine of Forum Non Conveniens in Anglo–American Law,* 29 Colum.L.Rev. 1 (1929). Although Blair found only three or four cases in which the American courts had used the term, he concluded:

> Upon an examination of the American decisions illustrative of the doctrine of *forum non conveniens,* it becomes apparent that the courts of this country have been for years applying the doctrine with such little consciousness of what they were doing as to remind one of Moliér's M. Jourdain, who found he had been speaking prose all his life without knowing it.

*Id.* at 21–22. Blair cited hundreds of cases dismissing suits for the same reasons now employed under the doctrine of forum non conveniens. *Id.* Following the publication of Blair's article, the United States Supreme Court applied the doctrine to suits in admiralty brought between aliens, *Charter Shipping Co. v. Bowring, Jones, & Tidy, Ltd.,* 281 U.S. 515, 517, 50 S.Ct. 400, 401, 74 L.Ed. 1008 (1930); *Canada Malting Co. v. Paterson S.S., Ltd.,* 285 U.S. 413, 422, 52 S.Ct. 413, 415, 76 L.Ed. 837 (1932); to cases involving the internal affairs of corporations, *Rogers v. Guaranty Trust Co.,* 288 U.S. 123, 130, 131, 53 S.Ct. 295, 297, 298, 77

L.Ed. 652 (1933); and to federal suits involving a state's system for regulating the oil industry, *Railroad Comm'n v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 584, 60 S.Ct. 1021, 1025, 84 L.Ed. 1368 (1940). *See* Barrett, *supra*, at 395–96. By 1941, "the familiar doctrine of 'forum non conveniens' ... [was] firmly imbedded in our law." *Baltimore & O.R.R. v. Kepner*, 314 U.S. 44, 55–56, 62 S.Ct. 6, 11–12, 86 L.Ed. 28 (1941) (Frankfurter, J., dissenting).

Texas courts applied the doctrine of forum non conveniens in several cases prior to the enactment of article 4678 in 1913. In 1890, this court in dicta recognized the power of a court to refuse to exercise jurisdiction on grounds essentially the same as those of forum non conveniens. *See Morris v. Missouri Pac. Ry.*, 78 Tex. 17, 21, 14 S.W. 228, 230 (1890). In *Morris*, we stated:

> We do not think the facts alleged show the action to be transitory. But, if so, it has been held in such actions, where the parties were non-residents and the cause of action originated beyond the limits of the state, these facts would justify the court in refusing to entertain jurisdiction. *Railway Co. v. Miller*, 19 Mich. 305. Jurisdiction is entertained in such cases only upon principles of comity, and not as a matter of right. Gardner v. Thomas, 14 Johns. 136; Wells, Juris. § 115.

*Id.* In *Mexican National Railroad v. Jackson*, 89 Tex. 107, 33 S.W. 857 (1896), this court discussed both the dissimilarity doctrine and the potentiality of docket backlog. With regard to the latter, we stated:

> If our courts assume to adjust the rights of parties against those railroads, growing out of such facts as in this case, we will offer an invitation to all such persons who might prefer to resort to tribunals in which the rules of procedure are more certainly fixed, and the trial by jury secured, to seek the courts of this state to enforce their claims. Thus we would add to the already overburdened condition of our dockets in all the courts, and thereby make the settlement of rights originating outside the state, under the laws of a different government, a charge upon our own people.

*Id.*, 89 Tex. at 112, 33 S.W. at 862. Finally, we made a statement closely resembling a current argument for forum non conveniens:

> If the facts showed that this [suit] was necessary in order to secure justice, and the laws were such as we could properly enforce, this consideration [docket backlog] would have but little weight; but we feel that it is entitled to be considered *where the plaintiff chooses this jurisdiction as a matter of convenience, and not of necessity.*

*Id.* (emphasis added).

In *Southern Pacific Co. v. Graham*, 12 Tex.Civ.App. 565, 34 S.W. 135 (1896, writ ref'd), the court stated that a district court could, in the exercise of its sound discretion, refuse to entertain jurisdiction in a case involving foreign parties. In *Missouri, Kansas & Texas Railway v. Godair Commission Co.*, 39 Tex.Civ.App. 298, 87 S.W. 871 (1905, writ ref'd), the court stated:

> Appellant's first proposition ... is ... that all parties being nonresidents, and the injuries complained of having occurred outside of the state of Texas, the courts of this state are not bound to entertain jurisdiction. The language of this proposition implies that the state courts may entertain jurisdiction of causes in which all parties are nonresidents when the injuries complained of occurred outside of the state, though they are not bound to do so. This being true, the court in this case having entertained jurisdiction, and thus [having] determined the question of public policy in favor of entertaining jurisdiction, the appellant has no right to complain.

*Id.* 39 Tex.Civ.App. at 301; 87 S.W. at 872. Thus, although Justice Gonzalez is correct that the first reported case using the term "forum non conveniens" is *Garrett v. Phillips Petroleum Co.*, 218 S.W.2d 238, 239 (Tex.Civ.App.—Amarillo 1949, writ dism'd), the doctrine itself was effectively established in Texas before the enactment of article 4678 by the legislature in 1913.

## II.

We therefore must determine whether the legislature in 1913 statutorily abolished

the doctrine of forum non conveniens in suits brought under article 4678 [now section 71.031].

Our interpretation of section 71.031 is controlled by this court's refusal of writ of error in *Allen v. Bass*, 47 S.W.2d 426 (Tex. Civ.App.—El Paso 1932, writ ref'd). In *Allen* the court of civil appeals held that old article 4678 conferred an absolute right to maintain a properly brought suit in Texas courts. The suit in *Allen* involved a New Mexico plaintiff and defendant arising out of an accident occurring in New Mexico. The court of appeals reversed a dismissal granted by the trial court on grounds similar to those of forum non conveniens, holding that "article 4678 opens the courts of this state to citizens of a neighboring state and gives to them an *absolute right* to maintain a transitory action of the present nature and to try their cases in the courts of this state." *Id.* at 427 (emphasis added).

The El Paso Court of Civil Appeals clearly addressed and rejected the doctrine of forum non conveniens in *Allen*. Discussing the existence of the doctrine prior to the 1913 and 1917 enactments of article 4678, the court stated:

Under the many authorities we have reviewed, both state and federal, we think it might be said that the courts of this state *had* a discretion in the matter of exercising jurisdiction where all parties were nonresidents of the state, and the cause of action arose in the state of the nonresidents.

*Id.* at 426 (emphasis added). Although the court did not specify the authorities it reviewed, it is clear from the Application for Writ of Error filed in this court that the Court of Civil Appeals reviewed two pre–1913 forum non conveniens cases—*Morris v. Missouri Pacific Railway, supra,* and *Southern Pacific Co. v. Graham, supra.* *See* Application for Writ of Error, *Bass v. Allen,* App. No. 18857 (filed April 7, 1932), at 2. The petitioner before this court in *Allen* summarized the case as follows:

Before the passage of any statute in Texas[,] trial courts had the discretion to refuse to entertain jurisdiction of a case

founded on tort committed in another State by and on residents of the State in which the tort was committed.

Morris v. Ry. Co., supra.

Bowman v. Flint, supra.

In the case of *Southern Pacific v. Graham* the opinion reads in part as follows:

'Had the District Court in the exercise of a sound discretion, refused to entertain jurisdiction of the case at all, this court would not have felt called upon to review its action.'

The Court of Civil Appeals in the instant case [*Allen*] held that to be true but under Article 4678 this discretion no longer existed and that it was now obligatory on the district courts to accept jurisdiction and try these cases.

*Id.* at 2–3. The petitioner in *Allen* argued that the Court of Civil Appeals erred in construing the term "foreign state" in article 4678 to include a state of the union. *Id.* at 4. The petitioner in *Allen* also argued that the Court of Civil Appeals erred in applying forum non conveniens to a cause of action arising in another state in the union:

While it is perhaps just and right to open our courts for the trial of causes arising in foreign countries where the denial of a forum might mean the denial of his remedial rights, still no such just demand could be made by residents of sister States against a resident of his own State for a cause which can with more ease and economy and justice be tried in that forum.

*Id.* at 4. Asking that this court reverse the decision of the Court of Civil Appeals and affirm the judgment of the trial court dismissing the action, the petitioners in *Allen* quoted from *Atchison, T. & S.F. Ry. Co. v. Weeks,* 254 F. 513 (5th Cir.1918). *Id.* at 5. In *Weeks,* the United States Court of Appeals for the Fifth Circuit discussed several of the same rationales given today for the application of the doctrine of forum non conveniens:

Manifestly, there are many advantages in trying such a case where the cause of action arises. The law of the cause of

action is the law of the place. It may be assumed that the courts of the state can more satisfactorily administer the laws of the state than can the courts of any other state. The expense incident to a trial would usually be materially less at the place of the tort than elsewhere. The imposition upon a state of the expense of maintaining courts to try causes in which the state has no interest would be difficult to justify. The maintenance of the judicial machinery involves no light burden. Many of the states, including Texas, have been unable to provide adequate machinery. No good reason could probably be made to appear why her overworked courts should be compelled to carry any part of the burdens of other states.

*Id.* at 518, *cited in,* Application for Writ of Error, *Bass v. Allen, supra,* at 5. Given these arguments and authorities, this court chose to refuse the Application for Writ of Error, thereby manifesting its approval of the decision of the Court of Civil Appeals in *Allen v. Bass. Cf., Hamilton v. Empire Gas & Fuel Co.,* 134 Tex. 377, 383–84, 110 S.W.2d 561, 565–66 (Tex.Comm'n App.1937, opinion adopted).

We conclude that the legislature has statutorily abolished the doctrine of forum non conveniens in suits brought under section 71.031. Accordingly, we affirm the judgment of the court of appeals, remanding the cause to the trial court for further proceedings.

HIGHTOWER and DOGGETT, JJ., file concurring opinions.

PHILLIPS, C.J., and GONZALEZ, COOK and HECHT, JJ., file dissenting opinions.

HIGHTOWER, Justice, concurring.

Because my dissenting brethren are so enthusiastic in their praise of the doctrine of *forum non conveniens,* I must add a few lines of concurrence with the majority opinion. Although I would like to join the chorus singing the praises of the doctrine of *forum non conveniens,* I am unable to do so because the Texas legislature statu-torily abolished the doctrine of *forum non conveniens* when it enacted the predecessors of section 71.031. TEX.CIV.PRAC. & REM.CODE ANN. § 71.031 (Vernon 1986).

The evolution of the common law has been accomplished by good judgment and common sense filling in the pages left blank by legislative bodies. Great legal minds have masterfully developed concepts that have contributed to the strength of our civilization. Although the common law doctrine of *forum non conveniens* has been defined in recent history, the idea is a useful tool of judicial administration in those jurisdictions that have chosen to adopt it. As the dissenting opinions point out, Texas is in a distinct minority of jurisdictions that have taken a different track.

The fact that this court has waited so long to write on the doctrine is not important. Although several opportunities have been presented, the court based its decisions on other issues. In the case at hand, the doctrine is squarely before the court. The issue for this court, however, is not whether the doctrine is a good, fair, and desirable one for the people of Texas; the issue is whether the doctrine is available because of legislative actions that have been taken.

The argument is made that section 71.-031 is in fact permissive, not mandatory. In the court of appeals, the petitioners argued "that the use of the words '*may be enforced*' indicates that the legislature recognized the trial court's discretionary power to dismiss." 751 S.W.2d at 210 (emphasis in original). I believe that this is an incorrect interpretation of "may be enforced." In enacting section 71.031, the legislature stated that under certain circumstances, "[a]n action for damages for the death or personal injury ... may be enforced in the courts of this state, although the wrongful act, neglect, or default causing the death or injury takes place in a foreign state or country...." In other words, subject to certain limitations, causes of action for death or personal injuries are enforceable in Texas. Since the legislature has opened the courts to certain plaintiffs in certain cases by statutory en-

actment, this court should not interfere by attempting to "rewrite" the statute.

The Texas legislature may not have intended to make Texas "the world's forum of final resort." However, the wording of section 71.031 is clear and we must respect what the legislature has done. If the legislature did not intend to statutorily preclude the adoption of the doctrine of *forum non conveniens*, however it may have been defined in 1913 when it enacted the predecessors of section 71.031, I encourage the legislature to amend section 71.031 to clarify its intent. Otherwise, the legislature's failure to act will evidence its adoption of our interpretation that the enactment of the predecessors of section 71.031 statutorily abolished the doctrine of *forum non conveniens*. *See Allen Sales and Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975).

The legislature has the privilege of changing its mind. Certainly it has done so many times since 1913. In writing the constitution, the founding fathers wisely provided for regular sessions of the legislature. What one legislature enacts another may later repeal. The court must respect the enactment when it is within the powers granted to the legislature by the constitution.

DOGGETT, Justice, concurring.

Because its analysis and reasoning are correct I join in the majority opinion without reservation. I write separately, however, to respond to the dissenters who mask their inability to agree among themselves with competing rhetoric.[1] In their zeal to implement their own preferred social policy that Texas corporations not be

held responsible at home for harm caused abroad, these dissenters refuse to be restrained by either express statutory language or the compelling precedent, previously approved by this very court, holding that forum non conveniens does not apply in Texas. To accomplish the desired social engineering, they must invoke yet another legal fiction with a fancy name to shield alleged wrongdoers, the so-called doctrine of *forum non conveniens*. The refusal of a Texas corporation to confront a Texas judge and jury is to be labelled "inconvenient" when what is really involved is not convenience but connivance to avoid corporate accountability.

The dissenters are insistent that a jury of Texans be denied the opportunity to evaluate the conduct of a Texas corporation concerning decisions it made in Texas because the only ones allegedly hurt are foreigners. Fortunately Texans are not so provincial and narrow-minded as these dissenters presume. Our citizenry recognizes that a wrong does not fade away because its immediate consequences are first felt far away rather than close to home. Never have we been required to forfeit our membership in the human race in order to maintain our proud heritage as citizens of Texas.

The dissenters argue that it is *inconvenient* and *unfair* for farmworkers allegedly suffering permanent physical and mental injuries, including irreversible sterility, to seek redress by suing a multinational corporation in a court three blocks away from its world headquarters and another corporation, which operates in Texas this country's largest chemical plant. Because the "doctrine" they advocate has nothing to do

---

1. It is neither I nor the majority who find it necessary to have opinions or statutes "twisted." Gonzalez dissent, 786 S.W.2d 692. Today's majority merely reconfirms the action of the legislature in abolishing the doctrine of *forum non conveniens*. I do agree with Justice Gonzalez that "sweeping implementations of social welfare policy" are sought here—not by my concurrence but in the unswerving determination of the dissenters to protect the welfare of multinational corporations.

Not content to follow the law as it is, the dissenters create gloomy pictures of Texas without forum non conveniens. However, the public policy reasons they advance to circumvent the legislature's intent are invalid. Justice Hecht then challenges the majority to state the advantages of abolishing forum non conveniens and justify its holding on the grounds of public policy. When I do so, Justice Gonzalez, in apparent disagreement with Justice Hecht, complains at my acceptance of the Hecht challenge.

with fairness and convenience and everything to do with immunizing multinational corporations from accountability for their alleged torts causing injury abroad, I write separately.

## I. THE FACTS

Respondents claim that while working on a banana plantation in Costa Rica for Standard Fruit Company, an American subsidiary of Dole Fresh Fruit Company, headquartered in Boca Raton, Florida, they were required to handle dibromochloropropane ["DBCP"], a pesticide allegedly manufactured and furnished to Standard Fruit by Shell Oil Company ["Shell"] and Dow Chemical Company ["Dow"]. The Environmental Protection Agency issued a notice of intent to cancel all food uses of DBCP on September 22, 1977. 42 Fed.Reg. 48026 (1977). It followed with an order suspending registrations of pesticides containing DBCP on November 3, 1977. 42 Fed.Reg. 57543 (1977). Before and after the E.P.A.'s ban of DBCP in the United States, Shell and Dow apparently shipped several hundred thousand gallons of the pesticide to Costa Rica for use by Standard Fruit. The Respondents, Domingo Castro Alfaro and other plantation workers, filed suit in a state district court in Houston, Texas, alleging that their handling of DBCP caused them serious personal injuries for which Shell and Dow were liable under the theories of products liability, strict liability and breach of warranty.

Rejecting an initial contest to its authority by Shell and Dow, the trial court found that it had jurisdiction under Tex.Civ.Prac. & Rem.Code Ann. § 71.031 (Vernon 1986), but dismissed the cause on the grounds of forum non conveniens. The court of appeals reversed and remanded, holding that Section 71.031 provides a foreign plaintiff with an absolute right to maintain a death or personal injury cause of action in Texas without being subject to forum non conveniens dismissal. 751 S.W.2d 208. Shell and Dow have asked this court to reverse

the judgment of the court of appeals and affirm the trial court's dismissal.

Shell Oil Company is a multinational corporation with its world headquarters in Houston, Texas. Dow Chemical Company, though headquartered in Midland, Michigan, conducts extensive operations from its Dow Chemical USA building located in Houston. Dow operates this country's largest chemical manufacturing plant within 60 miles of Houston in Freeport, Texas. The district court where this lawsuit was filed is three blocks away from Shell's world headquarters, One Shell Plaza in downtown Houston.

Shell has stipulated that all of its more than 100,000 documents relating to DBCP are located or will be produced in Houston. Shell's medical and scientific witnesses are in Houston. The majority of Dow's documents and witnesses are located in Michigan, which is far closer to Houston (both in terms of geography and communications linkages) than to Costa Rica. The respondents have agreed to be available in Houston for independent medical examinations, for depositions and for trial. Most of the respondents' treating doctors and co-workers have agreed to testify in Houston. Conversely, Shell and Dow have purportedly refused to make their witnesses available in Costa Rica.

The banana plantation workers allegedly injured by DBCP were employed by an American company on American-owned land and grew Dole bananas for export solely to American tables. The chemical allegedly rendering the workers sterile was researched, formulated, tested, manufactured, labeled and shipped by an American company in the United States to another American company. The decision to manufacture DBCP for distribution and use in the third world was made by these two American companies in their corporate offices in the United States. Yet now Shell and Dow argue that the one part of this equation that should not be American is the legal consequences of their actions.

## II. FORUM NON CONVENIENS—"A COMMON LAW DOCTRINE OUT OF CONTROL"[2]

As a reading of Tex.Civ.Prac. & Rem. Code Ann. § 71.031 (Vernon 1986) makes clear, the doctrine of forum non conveniens has been statutorily abolished in Texas. The decision in *Allen v. Bass*, 47 S.W.2d 426 (Tex.Civ.App.—El Paso 1932, writ ref'd), approved by this court, clearly holds that, upon a showing of personal jurisdiction over a defendant, article 4678, now section 71.031 of the Texas Civil Practice & Remedies Code, "opens the courts of this state to citizens of a neighboring state and gives them an absolute right to maintain a transitory action of the present nature and to try their cases in the courts of this state." *Id.* at 427.

Displeased that *Allen* stands in the way of immunizing multinational corporations from suits seeking redress for their torts causing injury abroad, the dissenters doggedly attempt to circumvent this prece- dent.[3] Unsuccessful with arguments based upon Texas law, they criticize the court for not justifying its result on public policy grounds.

### A. USING THE "DOCTRINE" TO KILL THE LITIGATION ALTOGETHER

Both as a matter of law and of public policy, the doctrine of forum non conveniens is without justification. The proffered foundations for it are "considerations of fundamental fairness and sensible and effective judicial administration." Hecht dissent, 786 S.W.2d 703 (*quoting Adkins v. Chicago, R.I. & Pac. R.R.*, 54 Ill.2d 511, 301 N.E.2d 729, 730 (1973)). In fact, the doctrine is favored by multinational defendants[4] because a forum non conveniens dismissal is often outcome-determinative, effectively defeating the claim and denying the plaintiff recovery. The contorted result of the doctrine of forum non conveniens is to force foreign plaintiffs "to con-

---

2. Stewart, *Forum Non Conveniens: A Doctrine in Search of a Role*, 74 Cal.L.Rev. 1259, 1264 n. 18 (1986).

3. Justice Hecht argues that *Allen* is not controlling because it has not been subsequently followed. After citing the decisions of this court in *Couch v. Chevron Int'l Co.*, 682 S.W.2d 534, 535 (Tex.1984) and *Flaiz v. Moore*, 359 S.W.2d 872, 876 (Tex.1962), he adopts a strange new reading of opinions, stating that "*Couch* and *Flaiz* unmistakably disapproved of *Allen v. Bass* without even bothering to cite it." Hecht dissent, 786 S.W.2d 706. In Texas, we have not subscribed to the theory that opinions may be overruled without even informing anyone of such action. The doctrine of stare decisis is not usually discarded in such a cavalier manner through rejection of longstanding precedent by mere implication. Nothing said by the court in *Couch* is at all inconsistent with *Allen*. Rather, due to the appellate rules requiring preservation of error, this court never reached the issue of forum non conveniens in *Couch*. *See Couch*, 682 S.W.2d at 535.

Justice Gonzalez disregards *Allen* principally by reliance upon *Flaiz v. Moore*, 359 S.W.2d 872 (Tex.1962). This court did not reach the issue of forum non conveniens in *Flaiz*:

It should be pointed out that we have not considered or attempted to decide in this case: (1) the extent to which the forum non conveniens principle is recognized in Texas; (2) whether article 4678 is mandatory and deprives the court of any discretion....

359 S.W.2d at 876. Neither *Couch* nor *Flaiz* casts doubt upon the holding in *Allen*.

Justice Gonzalez next attempts to distinguish *Allen* by arguing that the only doctrine it involved was that of comity, not forum non conveniens. A review of *Allen* and the subsequently refused application for writ of error indicates that the issue of forum non conveniens was presented and rejected. Even more ironic is the fact that Justice Gonzalez includes comity as one of his forum non conveniens public interest factors. *See* Gonzalez dissent, 786 S.W.2d 690.

4. In an apparent attempt to gain access to favorable federal forum non conveniens rules and to avoid Texas procedural law, Shell and Dow removed this case to the United States District Court for the Southern District of Texas despite the clear absence of any basis for federal jurisdiction. United States District Judge DeAnda, in remanding the case, labeled Shell and Dow's efforts to distinguish plainly controlling authority against removal "specious."

Over three years after the plaintiffs filed this lawsuit in Houston, Shell and Dow obtained a dismissal of the action on forum non conveniens grounds. Extensive discovery had already been completed, interrogatories had already been answered by the individual plaintiffs and the individual plaintiffs had already agreed to appear in Houston for medical examinations and depositions. Many of the so-called "convenience" problems had already been resolved in this litigation prior to the dismissal under forum non conveniens.

vince the court that it is more convenient to sue in the United States, while the American defendant argues that ... [the foreign court] is the more convenient forum." Note *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond "Reyno",* 64 Texas L.Rev. 193, 215, nn. 144–46 (1985).

A forum non conveniens dismissal is often, in reality, a complete victory for the defendant. As noted in *Irish Nat'l Ins. Co. v. Aer Lingus Teoranta,* 739 F.2d 90, 91 (2d Cir.1984),

> [i]n some instances, ... invocation of the doctrine will send the case to a jurisdiction which has imposed such severe monetary limitations on recovery as to eliminate the likelihood that the case will be tried. When it is obvious that this will occur, discussion of convenience of witnesses takes on a Kafkaesque quality— everyone knows that no witnesses ever will be called to testify.

In using the term *forum non conveniens,* "the courts have taken refuge in a euphemistic vocabulary, one that glosses over the harsh fact that such dismissal is outcome-determination in a high percentage of the *forum non conveniens* cases...." Robertson, *Forum Non Conveniens in America and England: "A Rather Fantastic Fiction,"* 103 L.Q.Rev. 398, 409 (1987). Empirical data available demonstrate that less than four percent of cases dismissed

under the doctrine of forum non conveniens ever reach trial in a foreign court.[5] A forum non conveniens dismissal usually will end the litigation altogether, effectively excusing any liability of the defendant. The plaintiffs leave the courtroom without having had their case resolved on the merits.[6]

## B. THE *GULF OIL* FACTORS—BALANCED TOWARD THE DEFENDANT

Courts today usually apply forum non conveniens by use of the factors set forth at length in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843–44, 91 L.Ed. 1055 (1947). Briefly summarized, those factors are (i) the private interests of the litigants (ease and cost of access to documents and witnesses); and (ii) the public interest factors (the interest of the forum state, the burden on the courts, and notions of judicial comity). In the forty-three years in which the courts have grappled with the *Gulf Oil* factors, it has become increasingly apparent that their application fails to promote fairness and convenience. Instead, these factors have been used by defendants to achieve objectives violative of public policy.

### 1. The Obsolete Private Interest Factors

In their discussion of the private interest factors supposedly designed to promote

---

**5.** Professor David Robertson of the University of Texas School of Law attempted to discover the subsequent history of each reported transnational case dismissed under forum non conveniens from *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) to the end of 1984. Data was received on 55 personal injury cases and 30 commercial cases. Of the 55 personal injury cases, only one was actually tried in a foreign court. Only two of the 30 commercial cases reached trial. *See* Robertson, *supra,* at 419.

**6.** Such a result in the name of "convenience" would undoubtedly follow a dismissal under forum non conveniens in the case at bar.

The plaintiffs, who earn approximately one dollar per hour working at the banana plantation, clearly cannot compete financially with Shell and Dow in carrying on the litigation. More importantly, the cost of just one trip to Houston to review the documents produced by Shell would exceed the estimated maximum possible recovery in Costa Rica. In an unchal-

lenged affidavit, a senior Costa Rican labor judge stated that the *maximum* possible recovery in Costa Rica would approximate 100,000 colones, just over $1,080 at current exchange rates. Assuming such a recovery were possible, no lawyer, in Costa Rica or elsewhere, could afford to take such a case—against two giant corporations vigilantly defending themselves in litigation. Further, Costa Rica permits neither jury trials nor depositions of nonparty witnesses. Attempting to depose a Dow representative concerning the company's knowledge of DBCP hazards will prove to be an impossible task as Dow is not required to produce that person in Costa Rica.

It is not unlikely that Shell and Dow seek a forum non conveniens dismissal not in pursuit of fairness and convenience, but rather as a shield against the litigation itself. If successful, Shell and Dow, like many American multinational corporations before them, would have secured a largely impenetrable shield against meaningful lawsuits for their alleged torts causing injury abroad.

convenience and fairness, the dissenters choose to avoid entire bodies of law concerning jurisdiction and venue. The dissenters ignore 154 years of Texas venue law designed to give defendants the privilege of being sued in their home country. *See* Langley, *A Suggested Revision of the Texas Venue Statute*, 30 Tex.L.Rev. 547, 547 (1952). Texas has generated more case law concerning venue than the other forty-nine states combined and has recently enacted a new venue statute. *See* Note, *Venue Procedure in Texas: An Analysis of the 1983 Amendments to the Rules of Civil Procedure Governing Venue Practice Under the New Venue Statute*, 36 Baylor L.Rev. 241, 242 n. 13, 253 (1984). It is ironic that defendants for years have sought to preserve a right to be sued in a home country, yet Shell nevertheless argues that when it is sued in its hometown, the legal fiction of forum non conveniens is needed to ensure *convenience* and *fairness*.

In his dissent, Justice Gonzalez correctly crystalizes the private interest factors as "those considerations that make the trial of a case relatively easy, expeditious, and inexpensive for the parties." 786 S.W.2d 695. Advances in transportation and communications technology have rendered the private factors largely irrelevant:

> A forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel. It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meaning of "non conveniens."

*Calavo Growers of California v. Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman J., concurring). *See also McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a

State where he engages in economic activity."). One judge asked whether "the entire doctrine of *forum non conveniens* should not be reexamined in the light of the transportation revolution that has occurred since [*Gulf Oil*]." *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 456 (2d Cir.1975) (Oakes, J., dissenting), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). Even Justice Hecht, in his dissent, recognizes that these factors have been rendered largely obsolete: "Ease of travel and communication, availability of evidence by videotape and facsimile transmission, and other technological advances have reduced the significance of some private inconvenience factors." 786 S.W.2d 708.[7] In sum, the private factors are no longer a predominant consideration—fairness and convenience to the parties have been thrust out of the forum non conveniens equation. As the "doctrine" is now applied, the term "forum non conveniens" has clearly become a misnomer.

### 2. The Public Interest Factors

The three public interest factors asserted by Justice Gonzalez may be summarized as (1) whether the interests of the jurisdiction are sufficient to justify entertaining the lawsuit; (2) the potential for docket backlog; and (3) judicial comity.

#### a. The Interest of Texas

The dissenting members of the court falsely attempt to paint a picture of Texas becoming an "irresistable forum for all mass disaster lawsuits," Gonzalez dissent, 786 S.W.2d 690, and for "personal injury cases from around the world", Hecht dissent, 786 S.W.2d 707. They suggest that our citizens will be forced to hear cases in which "[t]he interest of Texas in these disputes is likely to be ... slight," Cook dissent, 786 S.W.2d 697. Although these suppositions undoubtedly will serve to stir public debate, they have little basis in fact.

---

**7.** It is interesting that Justice Hecht pronounces the doctrine as one founded in considerations of "fundamental fairness," only to later reject the private factors—the doctrine's only focus on fairness to the parties. Nevertheless, he clings to the so-called doctrine of convenience, claiming that "[t]he public factors, however, deserve the same consideration now as when *Gulf Oil* was written." 786 S.W.2d 708.

The dissenting justices each know that for a Texas jury to hear a case, Texas must obtain *in personam jurisdiction* over the defendants in question. *See Gulf Oil,* 330 U.S. at 504, 67 S.Ct. at 841 ("[T]he doctrine of *forum non conveniens* can never apply if there is an absence of jurisdiction or mistake of venue."). As Justice Cook correctly notes, a state's power to assert its jurisdiction is limited by the due process clause of the United States Constitution. In *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the United States Supreme Court held that a state may exercise in personam jurisdiction only when a defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (*quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Under *Schlobohm v. Schapiro,* 784 S.W.2d 355 (Tex.1990), a defendant must have sufficient contacts with Texas in each lawsuit such that the assertion of jurisdiction comports with fair play and substantial justice.

Due process mandates that these requirements be satisfied before a Texas court may assert jurisdiction over a defendant. The personal jurisdiction-due process analysis will ensure that Texas has a sufficient interest in each case entertained in our state's courts.[8]

---

**8.** Justice Cook seems to suggest that it may violate due process for Shell to be sued in Houston. It is an extremely novel holding, unprecedented in American constitutional law, that a corporation could be denied due process by being sued in its hometown. Justice Cook argues in his dissent that "the due process test has not developed answers ... to questions regarding considerations of fairness." He claims that forum non conveniens has "bridged the gap in the development of the due process test," and concludes that "the majority shatters that bridge." 786 S.W.2d 702. Justice Cook is wrong on both counts. The due process test in personal jurisdiction cases, although admittedly complex, is developing fully and quickly. Since 1977, the Supreme Court has decided eleven major personal jurisdiction cases. *See e.g., Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Insurance Corp. of Ireland v. Campagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Rush v. Savchuk,* 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

Justice Cook confuses two distinct issues in suggesting that forum non conveniens should be used to "bridge the gap" in the development of the due process test. Forum non conveniens is never considered until and unless the personal jurisdiction-due process determination is complete. *See Gulf Oil,* 330 U.S. at 504, 67 S.Ct. at 841. Justice Cook's backward reasoning illustrates a significant problem with relying on the doctrine of forum non conveniens, explained by one commentator as follows:

> Issues going to the existence of jurisdiction are conceptualised as turning on rules and principles which, however flexible and open-textured, lend an element of solidity that is wholly lacking for discretionary decisions to decline to exercise jurisdiction.... When judges have too much jurisdiction-declining discretion, they will inevitably not put in the hard work necessary to formulate and apply sensible jurisdictional rules. What has happened in American jurisprudence is a form of "buck passing" whereby the vague and amorphous *"forum non conveniens* doctrine has come to accomodate the collective shortcomings and excesses of modern rules governing jurisdiction, venue, and choice of law."

Robertson, *supra,* 103 L.Q.Rev. at 424 (citations omitted). The use of the "doctrine" in other jurisdictions has produced an incoherent and disordered body of case law as judges often have ignored the law concerning in personam jurisdiction in favor of the unbridled discretion they enjoy in dismissing cases under forum non conveniens. *See* Stein, *Forum Non Conveniens and the Redundancy of Court–Access Doctrine,* 133 U.Pa.L.Rev. 781, 785 (1985) (forum non conveniens has resulted in "a crazy quilt of ad hoc, capricious, and inconsistent decisions."). *See also* Stewart, *Forum Non Conveniens: A Doctrine in Search of A Role,* 74 Cal.L.Rev. 1259, 1324 (1986) (arguing that forum non conveniens should be abolished because "[t]he factors and policies to which the doctrine calls the court's attention ... are best considered in the jurisdictional contexts."). The "considerations of fairness" discussed by Justice Cook may best be achieved "by following the jurisdictional rules strictly rather than construing a malleable doc-

Specifically, Texas has a substantial interest in the case at bar. As stated previously, this suit has been filed against Shell, a corporation with its world headquarters in *Texas*, doing extensive business in *Texas* and manufacturing chemicals in *Texas*. The suit arose out of alleged acts occurring in *Texas* and alleged decisions made in *Texas*. The suit also has been filed against Dow, a corporation with its headquarters in Michigan, but apparently having substantial contacts with *Texas*. Dow operates the country's largest chemical plant in *Texas*, manufacturing chemicals within sixty miles of the largest population center in *Texas*, where millions of *Texans* reside. Shell and Dow cannot now seek to avoid the *Texas* civil justice system and a jury of *Texans*.

### b. Docket Backlog

The next justification offered by the dissenters for invoking the legal fiction of "inconvenience" is that judges will be overworked. Not only will foreigners take our jobs, as we are told in the popular press; now they will have our courts. The xenophobic suggestion that foreigners will take over our courts "forcing our residents to wait in the corridors of our courthouses while foreign causes of action are tried," Gonzalez dissent, 786 S.W.2d at 690, is both misleading and false.

It is the height of deception to suggest that docket backlogs in our state's urban centers are caused by so-called "foreign litigation." This assertion is unsubstantiated empirically both in Texas and in other jurisdictions rejecting forum non conve-

niens.[9] Ten states, including Texas, have not recognized the doctrine. Within these states, there is no evidence that the docket congestion predicted by the dissenters has actually occurred. The best evidence, of course, comes from Texas itself. Although foreign citizens have enjoyed the statutory right to sue defendants living or doing business here since the 1913 enactment of the predecessor to Section 71.031 of the Texas Civil Practice and Remedies Code, reaffirmed in the 1932 decision in *Allen*, Texas has not been flooded by foreign causes of action.

Moreover, the United States Supreme Court has indicated that docket congestion "is a wholly inappropriate consideration in virtually every other context." Robertson, *supra*, 103 L.Q.Rev. at 408. *See Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336, 344–45, 96 S.Ct. 584, 589–90, 46 L.Ed.2d 542 (1976) (remanding a case to state court because the federal court "considers itself too busy to try it" is improper). *See also United States v. Reliable Transfer Co.*, 421 U.S. 397, 408, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975) ("Congestion in the courts cannot justify a legal rule that produces unjust results in litigation...."). If we begin to refuse to hear lawsuits properly filed in Texas because they are sure to require time, we set a precedent that can be employed to deny Texans access to these same courts.

Nor does forum non conveniens afford a panacea for eradicating congestion:

trine with virtually no appellate review to negate the formal jurisdictional rules." Note, *An Economic Approach to Forum Non Conveniens Dismissals Requested by U.S. Multinational Corporations*, 22 Geo.Wash.J.Int'l L. & Econ. 215, 216 n. 11 (1988) [hereinafter *"Economic Approach"*].

9. Evidence from the most recent and largest national study ever performed regarding the pace of litigation in urban trial courts suggests that there is no empirical basis for the dissenters' argument that Texas dockets will become clogged without forum non conveniens. The state of Massachusetts recognizes forum non conveniens. *See Minnis v. Peebles*, 24 Mass.App. 467, 510 N.E.2d 289 (1987). Conversely, the state of Louisiana has explicitly not recognized

forum non conveniens since 1967. *See Kassapas v. Arkon Shipping Agency, Inc.*, 485 So.2d 565, 567 (La.App.1986), *writ denied*, 488 So.2d 203 (1986), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *Trahan v. Phoenix Ins. Co.*, 200 So.2d 118, 122 (La.App.1967). Nevertheless, the study revealed the median filing-to-disposition time for tort cases in Boston to be 953 days; in New Orleans, with no forum non conveniens, the median time for the disposition of tort cases was only 405 days. The study revealed the median disposition time for contract cases in Boston to be 1580 days, as opposed to a mere 271 days in New Orleans where forum non conveniens is not used. J. Goerdt, C. Lomvardias, G. Gallas & B. Mahoney, *Examining Court Delay—The Pace of Litigation in 26 Urban Trial Courts*, 1987 20, 22 (1989).

Making the place of trial turn on a largely imponderable exercise of judicial discretion is extremely costly. Even the strongest proponents of the most suitable forum approach concede that it is inappropriately time-consuming and wasteful for the parties to have to "litigate in order to determine where they shall litigate." If forum non conveniens outcomes are not predictable, such litigation is bound to occur.... In terms of delay, expense, uncertainty, and a fundamental loss of judicial accountability, the most suitable forum version of forum non conveniens clearly costs more than it is worth.

Robertson, *supra*, 103 L.Q.Rev. at 414, 426.

#### c. Judicial Comity

Comity—deference shown to the interests of the foreign forum—is a consideration best achieved by rejecting forum non conveniens. Comity is not achieved when the United States allows its multinational corporations to adhere to a double standard when operating abroad and subsequently refuses to hold them accountable for those actions. As S. Jacob Scherr, Senior Project Attorney for the Natural Resources Defense Counsel, has noted

There is a sense of outrage on the part of many poor countries where citizens are the most vulnerable to exports of hazardous drugs, pesticides and food

products. At the 1977 meeting of the UNEP Governing Council, Dr. J.C. Kiano, the Kenyan minister for water development, warned that developing nations will no longer tolerate being used as dumping grounds for products that had not been adequately tested "and that their peoples should not be used as guinea pigs for determining the safety of chemicals."

Comment, *U.S. Exports Banned For Domestic Use, But Exported to Third World Countries,* 6 Int'l Tr.L.J. 95, 98 (1980–81) [hereinafter *"U.S. Exports Banned"*].

Comity is best achieved by "avoiding the possibility of 'incurring the wrath and distrust of the Third World as it increasingly recognizes that it is being used as the industrial world's garbage can.'" Note, *Hazardous Exports From A Human Rights Perspective,* 14 Sw.U.L.Rev. 81, 101 (1983) [hereinafter *"Hazardous Exports"*] (quoting Hon. Michael D. Barnes (Representative in Congress representing Maryland)).[10]

The factors announced in *Gulf Oil* fail to achieve fairness and convenience. The public interest factors are designed to favor dismissal and do little to promote the efficient administration of justice. It is clear that the application of forum non conveniens would produce muddled and unpredictable case law,[11] and would be used by defendants to terminate litigation be-

---

**10.** A senior vice-president of a United States multinational corporation acknowledged that "[t]he realization at corporate headquarters that liability for any [industrial] disaster would be decided in the U.S. courts, more than pressure from Third World governments, has forced companies to tighten safety procedures, upgrade plants, supervise maintenance more closely and educate workers and communities." WALL ST. J., Nov. 26, 1985, at 22, col. 4 (quoting Harold Corbett, senior vice-president for environmental affairs at Monsanto Co.).

**11.** Today's opinions reveal the legal monstrosity that would be created in Texas if forum non conveniens were applied. Justice Hecht and Justice Gonzalez each predict dire consequences of a Texas without forum non conveniens. Chief Justice Phillips correctly admits that no such predictions can be supported. The doctrine has been developing for over 100 years, yet Justice Gonzalez asserts that the doctrine "was at best incipient among the states" until 1947.

Justice Hecht states that Texas is "the only jurisdiction on earth" with the position taken today; however, earlier in the same opinion, he admits that ten states in the United States have not adopted forum non conveniens.

Each of the dissenters strongly advocates forum non conveniens for Texas. However, they cannot arrive at a collective decision regarding its application. While Justice Hecht correctly acknowledges that the private interest factors are outdated and useless, Justice Gonzalez and Chief Justice Phillips advocate both the private and public interest factors. While Justice Gonzalez correctly notes that before the doctrine may be applied, jurisdiction must be proper, Justice Cook argues that the doctrine is needed to help bridge the gap in the jurisdictional rules. The conflicting views of the dissenters surely portend the confused and unpredictable decisions which would inevitably result from attempts by Texas trial judges to apply the doctrine.

fore a consideration of the merits ever occurs.

## III. PUBLIC POLICY & THE TORT LIABILITY OF MULTINATIONAL CORPORATIONS IN UNITED STATES COURTS

The abolition of forum non conveniens will further important public policy considerations by providing a check on the conduct of multinational corporations (MNCs). *See Economic Approach,* 22 Geo.Wash.J. Int'l L. & Econ. at 241. The misconduct of even a few multinational corporations can affect untold millions around the world.[12] For example, after the United States imposed a domestic ban on the sale of cancer-producing TRIS-treated children's sleepwear, American companies exported approximately 2.4 million pieces to Africa, Asia and South America. A similar pattern occurred when a ban was proposed for baby pacifiers that had been linked to choking deaths in infants. *Hazardous Exports, supra,* 14 Sw.U.L.Rev. at 82. These examples of indifference by some corporations towards children abroad are not unusual.[13]

The allegations against Shell and Dow, if proven true, would not be unique, since production of many chemicals banned for domestic use has thereafter continued for foreign marketing.[14] Professor Thomas McGarity, a respected authority in the field of environmental law, explained:

> During the mid–1970s, the United States Environmental Protection Agency (EPA) began to restrict the use of some pesticides because of their environmental effects, and the Occupational Safety and Health Administration (OSHA) established workplace exposure standards for toxic and hazardous substances in the manufacture of pesticides.... [I]t is clear that many pesticides that have been severely restricted in the United States are used without restriction in many Third World countries, with resulting harm to fieldworkers and the global environment.

McGarity, *Bhopal and the Export of Hazardous Technologies,* 20 Tex.Int'l L.J. 333, 334 (1985) (citations omitted). By 1976, "29 percent, or 161 million pounds, of all the

---

**12.** As one commentator observed, U.S. multinational corporations

> adhere to a double standard when operating abroad. The lack of stringent environmental regulations and worker safety standards abroad and the relaxed enforcement of such laws in industries using hazardous processes provide little incentive for [multinational corporations] to protect the safety of workers, to obtain liability insurance to guard against the hazard of product defects or toxic tort exposure, or to take precautions to minimize pollution to the environment. *This double standard has caused catastrophic damages to the environment and to human lives.*

Note, *Exporting Hazardous Industries: Should American Standards Apply?,* 20 Int'l L. & Pol. 777, 780–81 (1988) (emphasis added) (footnotes omitted) [hereinafter *"Exporting Hazardous Industries"*]. *See also* Diamond, *The Path of Progress Racks the Third World,* N.Y. Times, Dec. 12, 1984, at B1, col. 1.

**13.** A subsidiary of Sterling Drug Company advertised Winstrol, a synthetic male hormone severely restricted in the United States since it is associated with a number of side effects that the F.D.A. has called "virtually irreversible", in a Brazilian medical journal, picturing a healthy boy and recommending the drug to combat poor appetite, fatigue and weight loss. *U.S. Exports Banned, supra,* 6 Int'l Tr.L.J. at 96. The

same company is said to have marketed Dipyrone, a painkiller causing a fatal blood disease and characterized by the American Medical Association as for use only as "a last resort," as "Novaldin" in the Dominican Republic. "Novaldin" was advertised in the Dominican Republic with pictures of a child smiling about its agreeable taste. *Id.* at 97. "In 1975, thirteen children in Brazil died after coming into contact with a toxic pesticide whose use had been severely restricted in this country." *Hazardous Exports, supra,* 14 Sw.U.L.Rev. at 82.

**14.** Regarding Leptophos, a powerful and hazardous pesticide that was domestically banned, S. Jacob Scherr stated that

> In 1975 alone, Velsicol, a Texas-based corporation exported 3,092,842 pounds of Leptophos to thirty countries. Over half of that was shipped to Egypt, a country with no procedures for pesticide regulation or tolerance setting. In December 1976, the *Washington Post* reported that Leptophos use in Egypt resulted in the death of a number of farmers and illness in rural communities.... But despite the accumulation of data on Leptophos' severe neurotoxicity, Velsicol continued to market the product abroad for use on grain and vegetable crops while proclaiming the product's safety.

*U.S. Exports Banned,* 6 Int'l Tr.L.J. at 96.

pesticides exported by the United States were either unregistered or banned for domestic use." McWilliams, *Tom Sawyer's Apology: A Reevaluation of United States Pesticide Export Policy*, 8 Hastings Int'l & Comp.L.Rev. 61, 61 & n. 4 (1984). It is estimated that these pesticides poison 750,000 people in developing countries each year, of which 22,500 die. *Id.* at 62. Some estimates place the death toll from the "improper marketing of pesticides at 400,-000 lives a year." *Id.* at 62 n. 7.

Some United States multinational corporations will undoubtedly continue to endanger human life and the environment with such activities until the economic consequences of these actions are such that it becomes unprofitable to operate in this manner. At present, the tort laws of many third world countries are not yet developed. *An Economic Approach, supra,* 22 Geo. Wash.J.Int'l L. & Econ. at 222–23. Industrialization "is occurring faster than the development of domestic infrastructures necessary to deal with the problems associated with industry." *Exporting Hazardous Industries, supra,* 20 Int'l L. & Pol. at 791. When a court dismisses a case against a United States multinational corporation, it often removes the most effective restraint on corporate misconduct. *See An Economic Approach, supra,* 22 Geo.Wash.J.Int'l L. & Econ. at 241.

The doctrine of forum non conveniens is obsolete in a world in which markets are global · and in which ecologists have documented the delicate balance of all life on this planet... The parochial perspective embodied in the doctrine of forum non conveniens enables corporations to evade legal control merely because they are transnational. This perspective ignores the reality

that actions of our corporations affecting those abroad will also affect Texans. Although DBCP is banned from use within the United States, it and other similarly banned chemicals have been consumed by Texans eating foods imported from Costa Rica and elsewhere. *See* D. Weir & M. Schapiro, Circle of Poison 28–30, 77, 82–83 (1981).[15] In the absence of meaningful tort liability in the United States for their actions, some multinational corporations will continue to operate without adequate regard for the human and environmental costs of their actions. This result cannot be allowed to repeat itself for decades to come.

As a matter of law and of public policy, the doctrine of forum non conveniens should be abolished. Accordingly, I concur.

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent. For the reasons stated in Justice Hecht's dissenting opinion, I would hold that the doctrine of forum non conveniens is not foreclosed by TEX.CIV. PRAC. & REM.CODE § 71.031. While I agree that the statute allows these plaintiffs to bring suit in Texas, I cannot agree that the statutory language prohibits the trial court from applying any common law procedural defense. Is laches, for example, statutorily foreclosed in wrongful death cases? I think not. I would therefore overrule *Allen v. Bass,* 47 S.W.2d 426 (Tex.Civ.App.—El Paso 1932, writ ref'd.).

I regret our court's decision to discard a procedural tool which has proved useful to the federal judicial system and most of our sister states. Unlike my fellow dissenters, however, I lack the prescience to foretell

---

15. Less than one per cent of the imported fruits and vegetables are inspected for pesticides. General Accounting Office, *Pesticides: Better Sampling and Enforcement Needed on Imported Food* GAO/RCED–86–219 (Sept. 26, 1986), at 3. The GAO found that of the 7.3 billion pounds of bananas imported into the F.D.A.'s Dallas District (covering Texas) from countries other than Mexico in 1984, not a single sample was checked for illegal pesticide residues such as DBCP. *Id.* at 53. Even when its meager inspection program discovers illegal pesticides, the F.D.A. rarely sanctions the shipper or producer.

*Id.* at 4. The GAO found only eight instances over a six year period where any punitive action whatsoever was taken. *Id.* "United States consumers have suffered as pesticide-treated crops are imported to the United States, thus completing a circle of poison." McGarity, *supra,* 20 Tex.Int'l L.J. at 334. As just one example, from 1972 to 1976 American imports of produce from Mexico contained residues of Leptophos, the neurotoxic pesticide discussed previously at note 14. *U.S. Exports Banned, supra,* 6 Int'l Tr.L.J. at 97 n. 19.

whether dire consequences will follow. As the existence or not of forum non conveniens has long been an open question in Texas,[1] our courts have traditionally attracted a number of actions originating in foreign jurisdictions. Today's decision will probably accelerate that trend, but to what extent, and with what effect, I do not know. Further, in dissenting I express no intimation as to whether or not the doctrine of forum non conveniens would be appropriate under the facts of this particular case.

I would reverse that part of the judgment of the court of appeals which precludes the possibility of a forum non conveniens dismissal, affirm that part of the judgment which reverses the dismissal in this matter, and remand this cause to the trial court for a consideration of the factors set forth in *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843–44, 91 L.Ed. 1055 (1947), as modified to meet modern circumstances. *See generally* Note, *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond "Reyno"*, 64 Texas L.Rev. 193, 214–23 (1985).[2]

GONZALEZ, Justice, dissenting.

Under the guise of statutory construction, the court today abolishes the doctrine of *forum non conveniens* in suits brought pursuant to section 71.031 of the Civil Practice and Remedies Code. This decision makes us one of the few states in the Union without such a procedural tool,[1] and if the legislature fails to reinstate this doctrine, Texas will become an irresistible forum for all mass disaster lawsuits. *See generally*, Note, *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond Reyno*, 64 Tex.L.Rev. 193 (1985). "Bhopal"-type litigation, with little or no connection to Texas will *add* to our already crowded dockets, forcing our residents to wait in the corridors of our courthouses while foreign causes of action are tried.[2] I would hold that section 71.031 of the Texas Civil Practice and Remedies Code *does not* confer upon foreign litigants an *absolute right* to bring suit in Texas. Because I believe that trial courts have the inherent power to apply *forum non conveniens* in appropriate cases, I would provide guidelines and set parameters for its use. I would thus modify the judgment of the court of appeals and remand the cause to the trial court for further proceedings.

This cause of action arose in Costa Rica where certain Costa Rican agricultural workers suffered injuries allegedly as a result of exposure to a pesticide manufactured by the defendants. The injured workers are seeking to enforce in Texas courts claims for personal injuries that occurred in Costa Rica. Several suits involving many of the same plaintiffs and essentially the same defendants have previously been filed in the United States and then dismissed on *forum non conveniens* grounds.

In 1983, a group of plaintiffs filed suit in a Florida state court. That case was removed to a federal district court, which dismissed it on the basis of *forum non*

---

**1.** As the United States Supreme Court recently observed:

> [Texas] may not apply the same, or indeed, any forum non conveniens analysis.... Rather, as the Court of Appeals noted, it is possible that "Texas has constituted itself the world's forum of final resort, where suit for personal injury or death may always be filed if nowhere else."

*Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 144–45, 108 S.Ct. 1684, 1688–89, 100 L.Ed.2d 127, 135 (1988).

**2.** The trial court dismissed this cause under forum non conveniens without written expression of what factors, if any, it had considered. In order to facilitate appellate review, I would require the trial court to set forth written find-

ings and conclusions regarding those factors, either in the final judgment or in a separate document.

**1.** *See Chambers v. Merrell–Dow Pharmaceuticals*, 35 Ohio St.3d 123, 519 N.E.2d 370, 373, n. 3 (1988).

**2.** For example, in July 1988, there was an oil rig disaster in Scotland. A Texas lawyer went to Scotland, held a press conference, and wrote letters to victims or their families. He advised them that they had a good chance of trying their cases in Texas where awards would be much higher than elsewhere. Houston Post, July 18, 1988, at 13A, col. 1; The Times (London), July 18, 1988, at 20A, col. 1; Texas Lawyer, Sept. 26, 1988 at 3.

*conveniens.* The dismissal was affirmed on appeal. *Sibaja v. Dow Chem. Co.,* 757 F.2d 1215 (11th Cir.), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985).

In 1985, members of this group of plaintiffs filed suit in California. That case was subsequently removed to a federal court, which dismissed it on the basis of *forum non conveniens* in 1986. *Aguilar v. Dow Chem. Co.,* No. 86–4753 JGD (S.D.Cal. 1987).

In 1987, a federal district court in Florida once again addressed a cause of action filed by certain members of this group of plaintiffs. The court dismissed the action on the basis of *forum non conveniens. Barrantes Cabalceta v. Standard Fruit Co.,* 667 F.Supp. 833 (S.D.Fla.1987).

The case at bar was originally filed in state district court in Harris County, Texas in 1984. It was removed to federal court and then remanded to the district court where it was dismissed on the basis of *forum non conveniens.* The court of appeals reversed the judgment of the trial court and remanded the case for trial. It is this judgment that the court today affirms.

The term *forum non conveniens* refers to the discretionary power of a court to decline jurisdiction when the convenience of the parties and the ends of justice would be better served if the action were brought and tried in another forum. *Black's Law Dictionary,* 589 (5th ed, 1979). It is a sound doctrine rooted in public policy concerns of judicial economy and fairness, and it is recognized in Texas. *See, e.g., Flaiz v. Moore,* 353 S.W.2d 74 (Tex.Civ.App.—San Antonio), *rev'd on other grounds,* 359 S.W.2d 872 (Tex.1962); *see also McNutt v. Teledyne Indus., Inc.,* 693 S.W.2d 666 (Tex. App.—Dallas 1985, writ dism'd); *Van Winkle–Hooker Co. v. Rice,* 448 S.W.2d 824

(Tex.Civ.App.—Dallas 1969, no writ); *Cole v. Lee,* 435 S.W.2d 283 (Tex.Civ.App.—Dallas 1968, writ dism'd); *Forcum–Dean Co. v. Missouri Pac. R.R. Co.,* 341 S.W.2d 464 (Tex.Civ.App.—San Antonio 1960, writ dism'd). *"Forum non conveniens* is a necessary antidote to the greatly expanded jurisdiction provided by 'long-arm' statutes.... It is ... a 'flexible procedure for the discretionary determination of place of trial,' ... not a technique for leaving unpopular litigants without a court to press their claims." *Islamic Republic of Iran v. Pahlavi,* 478 N.Y.S.2d 597, 606–07, 62 N.Y.2d 474, 491, 467 N.E.2d 245, 254–55 (1984) (Meyer, J., dissenting) (citations omitted).

The court today [3] "conclude[s] that the legislature has statutorily abolished the doctrine of *forum non conveniens* in suits brought under section 71.031." 786 S.W.2d 674. I disagree. *Forum non conveniens* did not arrive upon the judicial landscape of this state until after the predecessors to section 71.031 were enacted. The statute that was to become section 71.031 was first enacted in 1913. Act of April 8, 1913, ch. 161, § 1, 1913 Tex.Gen.Laws 338, repealed by Act of May 17, 1985, ch. 959, § 9(1), 1985 Tex.Gen.Laws 3322. Before 1947, the year in which the U.S. Supreme Court endorsed the doctrine of *forum non conveniens* in *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the discretion to dismiss a case upon the basis of the unique assemblage of considerations recognized by the doctrine was at best incipient among the states; [4] such discretion was non-existent in Texas. *See* Note, *Recent Cases and Statutes,* 20 Tex.L.Rev. 609, 610–612 (1942). The first reported Texas case to identify *"forum non conveniens"* was *Garrett v. Phillips Petroleum Co.,* 218 S.W.2d 238 (Tex.Civ.App.—Amaril-

---

**3.** Until today, the issue of whether the legislature or the supreme court had abolished the doctrine of *forum non conveniens* was an open question. See *Flaiz v. Moore,* 359 S.W.2d 872, 876, (Tex.1962); *Couch v. Chevron International Co., Inc.,* 682 S.W.2d 534, 535 (Tex.1984) (per curiam).

**4.** *See* Stein, *Forum Non Conveniens and the Redundancy Court Access Doctrine,* 133 U.Pa.L.R.

781, 796 (1985) [hereinafter Stein] ("Although bearing a Latin name, the forum non conveniens doctrine is of relatively recent origin. Not until 1948 was the doctrine accepted for general application in the federal courts and it received little or no attention in the state courts until after federal adoption."); *see also* Comment, *Forum Non Conveniens: The Need for Legislation in Texas,* 54 Tex.L.Rev. 737, 740 (1976).

lo 1949, writ dism'd). I believe that the legislature was unacquainted with the doctrine of *forum non conveniens* and cannot be said to have abolished it.

Paxton Blair's conclusion in his article *The Doctrine of Forum Non Conveniens in Anglo–American Law,* 29 Colum.L.Rev. 1 (1929) that *forum non conveniens* has been employed in the state courts since 1817:

> seems questionable. Many of the state cases cited by [Blair] involved rules that absolutely barred the action.
>
> Such provisions, unlike *forum non conveniens,* did not provide the trial courts with discretion; rather, they absolutely precluded assertion of jurisdiction. Moreover, until 1929 it was thought that the doctrine was a violation of the privileges and immunities clause of the constitution....

Stein, 133 U.Pa.L.Rev. at 796 n. 43 (citations omitted); *see also* Barrett, *The Doctrine of Forum Non Conveniens,* 35 Cal.L. Rev. 380, 388–90 (1947); J. Hazard, *Civil Procedure,* § 2.31 (1985); Note, *Forum Non Conveniens in Georgia: A Critical Analysis and Proposal for Adoption,* 7 Ga.L.Rev. 744, 747, 749, n. 15 (1973) [hereinafter *Forum Non Conveniens in Georgia* ] ("After the publication of [Blair's article], the use of the phrase 'forum non conveniens' became quite familiar, but few American courts applied it. Not until the late 1940's did forum non conveniens really come of age in this country.") The court's reliance on Blair is misplaced.

The original version of section 71.031 was enacted in 1913 to give *Texas citizens* the right to maintain a cause of action in the courts of this State free from the threat of a dismissal under the dissimilarity doctrine. *See* Note, *The Texas Dissimilarity Doctrine as Applied to the Tort Law of Mexico—A Modern Evaluation,* 55 Tex. L.Rev. 1281, 1293 (1977) [hereinafter Note]; *see also* S. Bayitch & J. Siqueiros, *Conflict of Laws: Mexico and the United States* 152 (1968); Paulsen, *Foreign Law in Texas Courts,* 33 Tex.L.Rev. 437, 454 (1955);

Stumberg, *Conflict of Laws–Torts–Texas Decisions,* 9 Tex.L.Rev. 21, 30 (1930). The caption to the statute and subsection 2 both evidence this intent:

> PROTECTION OF CITIZENS OF THIS STATE INJURED IN FOREIGN COUNTRIES—PROVIDES ADEQUATE COMPENSATION THEREFOR
>
> [S.B. No. 75] Chapter 161
>
> An act for the protection of *persons of this State* who may be injured in a foreign country and providing for adequate compensation therefor, and declaring an emergency.
>
> Be it enacted by the Legislature of the State of Texas:
>
> Section 1. That whenever the death or personal injury of a citizen of this State or a country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by a wrongful act, neglect or default in any State, for which a right to maintain an action and recover damages in respect thereof is given by a statute or by law of such State, territory or foreign country, such right of action may be enforced in the courts of the United States, or in the courts of this State, within the time prescribed for the commencement of such action by the statute of this State, and the law of the former shall control in the maintenance of such action in all matters pertaing [pertaining] to procedure.
>
> Section 2. The fact that there is now no law permitting *citizens of this State* who receive injuries in a foreign country from bringing an action for said injuries under the laws of this State, creates an emergency and imperative public necessity requiring that the constitutional rule that bills shall be read upon three several days, should be suspended and it is hereby suspended, and this Act shall take effect from and after its passage.

Act of April 8, 1913, ch. 161, § 1, 1913 Tex.Gen.Laws 338 (Repealed 1985) (emphasis added). It does not follow from the language of this version of the statute or any of the subsequent versions [5] that the

---

**5.** The current version, section 71.031 of the Civil Practice and Remedies Code, provides:

(a) An action for damages for the death or personal injury of a citizen of this state, of the

legislature intended to give citizens of foreign countries an absolute right to maintain suits in Texas or to strip our courts of their equitable common law power to, on occasion and under certain circumstances, dismiss disputes that have only a tenuous connection to Texas.[6] Instead, the legislature was concerned with the preclusive effect of the dissimilarity doctrine upon actions brought by Texans injured in foreign countries and intended only to prohibit courts from dismissing a case solely on the grounds that the law to be applied in the case was dissimilar. *See* Note, 55 Tex.L. Rev. at 1293 (1977); *see also* Baade, *Conflict of Laws, 1974 Survey of Texas Law,* 28 Sw.L.J. 166, 216–217 (1974); Note, 2 Tex.L.Rev. 244, 246 (1924).

The doctrine of *forum non conveniens* cannot be equated to the dissimilarity doctrine. *See Flaiz,* 359 S.W.2d at 875. The legislature simply did not contemplate *forum non conveniens* when the statute was drafted. Similarly, subsequent amendments to the statute did not abrogate *forum non conveniens* dismissals. Therefore, because the purposes of the legislature in enacting and amending this statute are ascertainable, and because there is **absolutely** no indication that the legislature sought to abolish the doctrine, the court's assertion that the statute precludes *forum non conveniens* is indefensible. *See City of Mason v. West Texas Utilities,* 150 Tex. 18, 237 S.W.2d 273, 275, 278 (1951) ("the

aim and object of construction is to ascertain and enforce the legislative intent...."); *cf. Commonwealth of Massachusetts v. United North & South Development Co.,* 140 Tex. 417, 168 S.W.2d 226, 229 (1942) (interpretation by implication cannot be used to extend a statute when the legislative intent is discernible); *Taylor v. Firemen's and Policemen's Civil Service Commission of City of Lubbock,* 616 S.W.2d 187, 189 (Tex.1981) ("In the absence of a specific amendment, a statute should be given the meaning which it had when enacted").

The court appears to hold that this case turns upon the language in section 71.031, which states that an action "may be enforced in the courts of this State."[7] It then proceeds, however, to substitute the holding in *Allen v. Bass,* 47 S.W.2d 426 (Tex.Civ.App.—El Paso 1932, writ ref'd) wherein the court of appeals held that former article 4678 (now section 71.031) conferred an absolute right to maintain a suit in Texas courts, for an explanation of how that language precludes application of *forum non conveniens.* Yet in *Flaiz v. Moore,* 359 S.W.2d 872, 876 (Tex.1962), long after *Allen v. Bass* was decided, the Texas Supreme Court warned that it had not yet decided whether former article 4678 was mandatory such that a court could not exercise discretion in determining whether to entertain a suit having little or no connections with the State of Texas. *See also*

United States, or of a foreign country may be enforced in the courts of this state, although the wrongful act, neglect, or default causing the death or injury takes place in a foreign state or country, if:
    (1) a law of the foreign state or country or of this state gives a right to maintain an action for damages for the death or injury;
    (2) the action is begun in this state within the time provided by the laws of this state for beginning the action; and
    (3) in the case of a citizen of a foreign country, the country has equal treaty rights with the United States on behalf of its citizens.
    (b) All matters pertaining to procedure in the prosecution or maintenance of the action in the courts of this state are governed by the law of this state.
    (c) The court shall apply the rules of substantive law that are appropriate under the facts of this case.

6. It makes no sense to argue that the legislature in 1913 abolished the doctrine of *forum non conveniens* when the doctrine was not recognized in Texas at that time.

7. Dow and Shell contend that the legislature's use of the word "may" makes the statute permissive. They argue that both Kansas and Iowa have statutes similar to section 71.031 that also use the word "may" and that each applies the doctrine of *forum non conveniens.* Compare KAN.STAT.ANN. § 60–217(b) (1986) *and Gonzales v. Atchinson, Topeka, and Santa Fe Ry. Co.,* 189 Kan. 689, 371 P.2d 193 (1962) *with* IOWA CODE § 616.8 (1939) *and Silversmith v. Kenosha Auto Transport,* 301 N.W.2d 725, 727 (Iowa 1981). The court shuns this persuasive reasoning and chooses to hold that the language "may be enforced" in section 71.031 is mandatory thus precluding *forum non conveniens* dismissals.

Note, 41 Tex.L.Rev. 924, 927 n. 19 (1963). We reiterated this warning as late as 1984 in an opinion refusing an application for writ on grounds of no reversible error: "[T]he applicability of *forum non conveniens* to an article 4678 cause of action is an open question." *Couch v. Chevron International Co., Inc.,* 682 S.W.2d 534, 535 (Tex.1984) (per curiam), *citing Flaiz v. Moore,* 359 S.W.2d 872 (Tex.1962).

In short, *Allen v. Bass* does not control the issue of *forum non conveniens* dismissals under section 71.031 because that decision did not address the doctrine of *forum non conveniens. See McNutt v. Teledyne Indus., Inc.,* 693 S.W.2d 666, 668 (Tex.App. —Dallas 1985, writ dism'd) ("As we read *Allen,* the doctrine of *comity* was at issue, not the doctrine of *forum non conveniens*"). As stated earlier, the doctrine of *forum non conveniens* was not firmly established in American jurisdictions until the United States Supreme Court's seminal decision in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), some 15 years after *Allen v. Bass. See Willman v. McMillen,* 779 S.W.2d 583, 584–85 (Mo.1989); *Forum Non Conveniens in Georgia,* 7 Ga.L.Rev. at 748 n. 15 ("By 1947, only six states accepted the doctrine."); C. Wright, *Federal Courts* § 44 at p. 259 (4th ed. 1983); Stein, *supra,* fn. 4 at 796. Abrogation of the doctrine of *forum non conveniens* under section 71.-031 in a case such as this cannot be reasonably predicated upon *Allen v. Bass;* the

dismissal in that case, based upon the principals of comity, cannot be equated with *forum non conveniens.* Nowhere in *Allen v. Bass* is the doctrine of *forum non conveniens* discussed.

Comity considerations focus on deference to a sister state; *forum non conveniens* considerations allow the trial court to engage in a discretionary balancing of factors in order to determine the most appropriate forum for the litigation.[8] The comity dismissal ordered by the trial court in *Allen* did not involve the balancing of the public and private interests which inform a *forum non conveniens* decision,[9] and the opinion does not reflect that the court of appeals intended to abolish the doctrine of *forum non conveniens.*[10] A rule announced in a judicial opinion may not be disassociated from or taken out of the context of its facts. *W.D. Haden & Co. v. Dodger,* 158 Tex. 74, 308 S.W.2d 838, 840 (1958). Further, the phrase—"absolute right to maintain a transitory action"—used in *Allen v. Bass,* is improvidently relied upon by the court in reaching its result today. First, that language resulted from a group of cases establishing absolute open forums in order to avoid constitutional attacks under the privileges and immunities clause. Subsequently, the Supreme Court indicated that the privileges and immunities clause is no obstacle to a state vesting discretion in its courts to refuse to hear suits between nonresidents. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91

---

**8.** The court cites *Morris v. Missouri Pac. R.R.,* 78 Tex. 17, 14 S.W. 228, 230 (1890) as authority for the proposition that Texas courts had recognized *forum non conveniens* long before *Gulf Oil Corp. v. Gilbert.* That decision did not involve the doctrine of *forum non conveniens.* The *Morris* court never described or engaged in a balancing of public and private interest factors. Instead, the court explained the application of the doctrine of comity and affirmed the dismissal of the case by the trial court because the facts "indicate[d] the impolicy of entertaining jurisdiction ... upon principles of comity." *Id.* at 230. Similarly, in the cases *Mexican National Ry. Co. v. Jackson,* 89 Tex. 107, 33 S.W. 857 (1896), *Southern Pacific Co. v. Graham,* 12 Tex.Civ.App. 565, 34 S.W. 135 (1896, writ ref'd), and *Missouri, Kansas & Texas Ry. Co. of Texas v. Godair Comm'n Co.,* 87 S.W. 871 (Tex.Civ.App.1905, writ ref'd), cited by the

court, none of the opinions indicate that the court engaged in the discretionary balancing of public and private interest factors that is necessary in a proper *forum non conveniens* analysis.

**9.** Comity does not rely on a balancing of interest factors. Rather, it "is a willingness to grant a privilege, not as a matter of right, but out of deference and good will." Black's Law Dictionary, 5th ed. (1979). The principles of comity are not properly equated with the doctrine of *forum non conveniens.*

**10.** Until now, *Allen v. Bass* has been largely ignored. Imprecise language in the opinion is, regrettably, subject to manipulation. Accordingly, I would overrule *Allen v. Bass* in order to eradicate any possible confusion concerning the application of *forum non conveniens* to actions alleged under section 71.031.

L.Ed. 1055 (1947); Barrett, *The Doctrine of Forum Non Conveniens*, 35 Calif.L.Rev. 380, 393, n. 60; *cf. Broderick v. Rosner*, 294 U.S. 629, 643, 55 S.Ct. 589, 592, 79 L.Ed. 1100 (1935); *Williams v. North Carolina*, 317 U.S. 287, 294, n. 5, 63 S.Ct. 207, 211, n. 5, 87 L.Ed. 279 (1942) (under the full faith and credit clause, a state "may in appropriate cases apply the doctrine of '*forum non conveniens.*'"). Second, the conclusion of the court in *Allen v. Bass* that article 4678 gives an absolute right to maintain a transitory action is dicta except with respect to citizens of other states. *Allen v. Bass* simply is not controlling as to the question of whether the legislature statutorily abolished the doctrine of *forum non conveniens* in Texas suits brought under section 71.031 by residents of foreign countries.

*Forum non conveniens* is a common law doctrine "pertaining to procedure." *See Missouri ex rel. Southern Ry. Co. v. Mayfield*, 340 U.S. 1, 71 S.Ct. 1, 95 L.Ed. 3 (1950). I would therefore hold that the doctrine is applicable to cases alleged under section 71.031 by virtue of subsection (b), which provides:

> [A]ll matters *pertaining to procedure* in the prosecution or maintenance of the action in the courts of this state are governed by the laws of this state.

(emphasis added). *See* Note, 41 Tex.L.Rev. 924, 927, n. 16 (1963).

Because I believe that the doctrine of *forum non conveniens* is applicable to cases brought in the courts of this state, I would adopt the following guidelines for its use.

### Forum Non Conveniens Factors

At the outset it must be noted that the doctrine of *forum non conveniens* does not come into play until it is established that the trial court has both subject matter and personal jurisdiction. If there is any challenge to the court's jurisdiction over the parties or the subject matter, it must be resolved before the court may make the *forum non conveniens* determination. Thereafter, the doctrine may be invoked only by motion of a party, and the burden shall rest upon the movant to produce evidence which would authorize dismissal. This evidence must establish by a preponderance that the court should not accept trial of the case.

Once *forum non conveniens* has been invoked, the trial court should, as its first step, determine what substantive law governs the case under the relevant choice of law rules. *See In Re McClelland Engineers, Inc.*, 742 F.2d 837 (5th Cir.1984) (the first step in a *forum non conveniens* analysis is the determination of what substantive law governs the case). If the court concludes that a foreign law will govern the case, it may consider this as a factor weighing in favor of dismissal. *See* J. Hazard, *Civil Procedure*, § 2.31 (1985).

Next, it must be established that the plaintiff has an alternate forum—the doctrine presupposes at least two forums in which the defendant is amenable to process. *Gulf Oil*, 330 U.S. at 506–07, 67 S.Ct. at 842–43. An acceptable alternate forum does not exist when, for example, the plaintiff is unable to get personal jurisdiction of the defendant elsewhere. If no acceptable alternative exists, the case should not be dismissed regardless of the additional burdens which will be thrust upon the defendant. *See* Restatement (Second) of Conflict of Laws § 84 comment c at 251 (1969). And even if an acceptable alternate forum does exist, the trial court may not dismiss the case if the plaintiff is a resident of Texas.

Once the trial judge has determined that an acceptable alternate forum exists, the judge must then consider all relevant factors of public and private interest to determine if the interests of justice would be better served if the alternate jurisdiction adjudicated the case. Factors of private interest are those considerations that make the trial of a case relatively easy, expeditious, and inexpensive for the parties. Factors of public interest include: 1) those which take into account the burdens imposed upon the citizens of the forum state when controversies having no connection with the state are allowed to proceed to trial; 2) those which comprehend the bur-

dens which the trial will work upon the court itself; and 3) those which recognize the general interest in having localized controversies decided in the jurisdiction in which they arose. *See generally* Note, *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond Reyno,* 64 Tex.L. Rev. 193, 214 (1985). No single private or public interest factor should be outcome determinative; rather, each must be considered in relation to the others.

The consideration of public and private interest factors should be individualized on a case by case basis. Clearly, the general descriptions of those factors set forth above are capable of granulation into the more specific considerations necessitated by individual cases. *See, e.g., Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. at 843–44; *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257–261, 102 S.Ct. 252, 266–269, 70 L.Ed.2d 419 (1981); *In Re Air Crash Disaster Near New Orleans, La., on July 9, 1982,* 821 F.2d 1147, 1166 (5th Cir.1987); *Pain v. United Technologies Corp.,* 637 F.2d 775, 786–795 (D.C.Cir.1980); *Great Northern Railway Co. v. Superior Court, County of Alameda,* 12 Cal.App.3d 105, 112–116, 90 Cal.Rptr. 461, 466–467 (1970); *Credit Lyonnais Bank v. Manatt, et al,* 202 Cal. App.3d 1424, 1435, n. 17, 249 Cal.Rptr. 559, 565, n. 17 (1988); *Chambers v. Merrell–Dow Pharmaceuticals,* 35 Ohio St.3d 123, 132–33, 519 N.E.2d 370, 378–379 (1988); Note, *Forum Non Conveniens in California: Code of Civil Procedure Section 410.30,* 21 Hastings L.J. 1245–46 (1970). In each case, however, the trial judge must specify for the record each factor he or she considers and the manner in which these factors influenced the decision.

Accordingly, the *forum non conveniens* determination, though committed to the sound discretion of the trial court, must be carefully confined to a structured consideration of the relevant factors so that an appellate court may conduct a meaningful review of the decision. The trial judge may not, for example, dismiss a case from the plaintiff's chosen forum simply because, in the court's view, another forum may be superior to that chosen by the plaintiff. *See Pain,* 637 F.2d at 783. The

trial judge's discretion is not unlimited: "where there has been no *weighing* of the relative advantages of each forum but only a consideration of the drawbacks of one, that discretion has been abused." *Founding Church of Scientology v. Verlag,* 536 F.2d 429, 436 (D.C.Cir.1976) (emphasis in original); *see also Credit Lyonnais Bank,* 249 Cal.Rptr. at 566.

In the instant case, the trial judge dismissed the case without specifying on the record the factors which he considered and the way in which those considerations influenced his determination. I would reverse that part of the judgment of the court of appeals which precludes the possibility of a *forum non conveniens* dismissal, affirm that part of the judgment which reverses the dismissal, and remand this cause to the trial court for further proceedings not inconsistent with this opinion.

*Response to J. Doggett's Concurrence*

When you strip Justice Doggett's concurring opinion of its fiery rhetoric, it is clear that he has twisted my dissent to such an extent that ordinarily I would feel compelled to respond at length. Deprived of its rhetorical flourishes, however, his concurring opinion contains only the following conclusions:

(1) The legislature has abolished *forum non conveniens.* (We are not told when or how this was accomplished);

(2) "As a matter of law and of public policy," the doctrine "should be abolished." 786 S.W.2d 689. (Why is this necessary if, as J. Doggett and the plurality claims, this was done by the legislature long ago?);

(3) *Allen v. Bass* is "compelling precedent" that the plaintiffs have an absolute right to bring suits in Texas. (In *Flaiz v. Moore* and in *Couch v. Chevron,* we said that this issue was an open question);

(4) The legal systems of many countries of the world are not as generous as ours, and the doctrine of *forum non conveniens* is a barrier to holding greedy, irresponsible multinational corporations ac-

countable. The doctrine is therefore invalid on public policy grounds. (We are a court, not a legislative body. We do not have the power or authority to make this public policy decision).

Justice Doggett also criticizes the doctrine of *forum non conveniens* as "yet another legal fiction" and assumes that by calling it such he has challenged its validity. Taking this line of reasoning to its logical conclusion, it appears that Justice Doggett opposes the use of such legal fictions as corporations, constructive trusts, constructive notice, constructive fraud, and numerous others. In any event, he is incorrect in suggesting that *forum non conveniens* is a legal fiction, for a legal fiction is defined as an assumption of fact made by a court as a basis for deciding a legal question or a situation contrived by the law to permit a court to dispose of a matter. *See* Black's Law Dictionary (5th ed. 1979). *Forum non conveniens* requires the movant to prove to the court facts that warrant dismissal of the case.

In conclusion, I have no intent, much less "zeal" to implement social policy as Justice Doggett charges. That is not our role. It is clear that if anybody is trying to advance a particular social policy, it is Justice Doggett. I admire his altruism, and I too sympathize with the plight of the plaintiffs. However, the powers of this court are well-defined, and the sweeping implementations of social welfare policy Justice Doggett seeks to achieve by abolishing the doctrine of *forum non conveniens* are the exclusive domain of the legislature.

For all of the above reasons, I dissent.

COOK, Justice, dissenting.

Like turn-of-the-century wildcatters, the plaintiffs in this case searched all across the nation for a place to make their claims. Through three courts they moved, filing their lawsuits on one coast and then on the other. By each of those courts the plaintiffs were rejected, and so they continued their search for a more willing forum. Their efforts are finally rewarded. Today they hit pay dirt in Texas.

No reason exists, in law or in policy, to support their presence in this state. The legislature adopted within the statute the phrase "may be enforced" to permit plaintiffs to sue in Texas, irrespective of where they live or where the cause of action arose. The legislature did not adopt this statute, however, to remove from our courts all discretion to dismiss. To use the statute to sweep away, completely and finally, a common law doctrine painstakingly developed over the years is to infuse the statute with a power not contained in the words. Properly read, the statute is asymmetrical. Although it confers upon the plaintiffs an absolute right to bring claims in our courts, it does not impose upon our courts an absolute responsibility to entertain those claims.

Even if the statute supported the court's interpretation, however, I would remain unwilling to join in the opinion. The decision places too great a burden on defendants who are citizens of our state because, by abolishing *forum non conveniens*, the decision exposes our citizens to the claims of any plaintiff, no matter how distant from Texas is that plaintiff's home or cause of action. The interest of Texas in these disputes is likely to be as slight as the relationship of the plaintiffs to Texas. The interest of other nations, on the other hand, is likely to be substantial. For these reasons, I fear the decision allows assertions of jurisdiction by Texas courts that are so unfair and unreasonable as to violate the due process clause of the federal constitution.

I.  PERSONAL JURISDICTION—FROM PRESENCE TO FAIR PLAY

Over a century ago, the United States Supreme Court was called upon to decide the reach of a state's power to adjudicate a resident plaintiff's claim against an out-of-state defendant in a state court. The Court adopted and applied a simple rule: the state's power to adjudicate was circumscribed by its borders. If a defendant was present within those borders, then he was subject to the state's jurisdiction. Thus, the state courts in Oregon could enter a binding personal judgment against the de-

fendant if, and only if, he was personally served with process within the state or voluntarily appeared before the court. *Pennoyer v. Neff,* 95 U.S. 714, 720–23, 24 L.Ed. 565 (1878).

The presence rule was onerous for both plaintiffs and defendants. Plaintiffs had to capture defendants within a state's borders to serve process. The law compensated for this burden upon plaintiffs by allowing them to serve even transient defendants. This concession to plaintiffs worked a hardship on defendants, who were subjected to assertions of jurisdiction no matter how fleeting the passage of the defendants through a state. For this hardship, the common law provided relief of another kind: the notion that litigants should not be confined to inappropriate forums. This idea, which has developed into what we now call the doctrine of *forum non conveniens,* stepped in to bridge the gap between the interests of defendants and forums on the one hand and Pennoyer's dogmatic presence rule on the other. *See* Ehrenzweig, *The Transient Rule of Personal Jurisdiction: the "Power" Myth and Forum Conveniens,* 65 Yale L.J. 289, 292 (1956).

*Pennoyer's* jurisdictional scheme proved too simplistic for the complexities of modern life, with its large corporations and controversies involving multi-state elements. A new jurisdictional rule was necessary. It was formulated when the United States Supreme Court dispensed with the presence rule and redefined the nature and extent of a state's power to adjudicate in the case of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *Shoe,* the Court held that a state may exercise in personam jurisdiction over an out-of-state defendant when the defendant has certain minimum contacts with the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Id.* at 316, 66 S.Ct. at 158.

Two standards derived from *Shoe,* the first relating to the existence of contacts between an out-of-state defendant and the forum, the second relating to notions of fair play and reasonableness. Although the standards have appeared at times to merge into one idea, they have evolved over the years to perform different functions in the due process analysis.

The first standard departs from the traditional concept, described in *Pennoyer,* that imposition of jurisdiction is always proper where a defendant is present in the forum. In place of that concept, the *Shoe* Court developed the less stringent requirement that a defendant have "minimum contacts" with the forum. *Id.* at 316, 66 S.Ct. at 158. The second standard appears as a theme underlying the first. This theme expresses the Court's belief that irrespective of the contacts upon which a state's exercise of jurisdiction is based, jurisdiction must still be consistent with "fair play and substantial justice." *Id.*

It is the first standard, contacts, that dominates both the reasoning in *Shoe* and in most of the subsequent jurisdiction decisions of the Court. This standard has developed to incorporate most of the rules that inhibit a state in its exercise of jurisdiction over an out-of-state defendant. It is true that in the forty years following *Shoe,* courts dutifully recited the fair play standard. But once courts applied the analysis developed under the contacts standard and found that minimum contacts existed, courts did not have to be concerned that jurisdiction would falter upon application of the second, fair play, standard.

The dominance of *Shoe's* contacts standard diminished neither the need for nor recognition of the occasional application of the doctrine of *forum non conveniens.* In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1946), the United States Supreme Court acknowledged that a court may apply the doctrine and discussed the circumstances under which the doctrine is appropriate. These include both the private interest of the litigant and the public interest. Private interest considerations include the ease of access to sources of proof, the availability of witnesses, and any other practical problem that makes the trial of a case easy, expeditious, and inexpensive. *Id.* at 508, 67 S.Ct. at 843. Public

interest concerns focus on a court's attention on such factors such as the administrative difficulties that result from litigation pile-ups and the burden of jury duty upon communities which have no relation to the litigation. *Id.* at 508–09, 67 S.Ct. at 843. The *Gilbert* decision, which came only one year after *Shoe,* provided the same balance to *Shoe's* jurisdictional scheme that post-*Pennoyer* jurisprudence provided to the presence test. *Forum non conveniens,* although not explicitly dealt with in the jurisdictional analysis, was still the bridge that transversed the gap between constitutional doctrines of jurisdiction and problems arising from inconvenient forums.

The pre-eminence of contacts over fair play as a jurisdictional yardstick began to taper when the Court decided *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In *Volkswagen,* the Court both acknowledged the existence of the fair play standard and extracted from prior case law the elements that comprise this standard. They include: (1) the burden on a defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 292, 100 S.Ct. at 564.

*Volkswagen's* accumulation of these factors transformed the fair play standard from a dutifully recited incantation to a substantial test for gauging the propriety of jurisdictional assertions. Although not applied in *Volkswagen,* the factors contained the sum of ideas concerning fair play and substantial justice that had developed in case law over the years. Not surprisingly, the factors included and overlapped some of the same ideas that had been developing in the doctrine of *forum non conveniens.* The test for jurisdiction and the test for forum appropriateness were, therefore, undergoing parallel developments. *See generally Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court gave real power to the fair play standard by stating that minimum contacts, even where established, may be considered in light of the *Volkswagen* factors to determine whether the assertion of jurisdiction comports with fair play and substantial justice. *Id.* at 476, 105 S.Ct. at 2184. At the same time, the Court discussed the function of *forum non conveniens* in the context of a jurisdictional analysis. First, the Court conceded that, in most cases, the *Shoe* test of due process need never be implicated. Objections to jurisdiction arising from the fair play standard could be accommodated through a "means short of finding jurisdiction unreasonable." *Id.* at 477, 105 S.Ct. at 2184. In plainer words, a court could address the concerns inherent in the fair play standard without raising those concerns to the level of a constitutional inquiry. Second, the Court noted examples of "means short of finding jurisdiction unreasonable." Choice-of-law clashes, said the Court, may be accommodated through application of the forum's choice-of-law rules. Similarly, a defendant claiming substantial inconvenience may seek a change of venue under the federal venue statutes or *forum non conveniens.* *Id.*

The *Burger King* view of the proper place for *forum non conveniens* was, therefore, not so distant from the place the doctrine had occupied in the years following both *Pennoyer* and *Shoe.* The doctrine reached where the due process test of jurisdiction did not and, once again, bridged the gap between the due process test for jurisdiction and concerns about forum appropriateness. Where the law provided that bridge, there was no need for application of the *Volkswagen* factors. The Court made it clear, however, that where a defendant presents a compelling case that the presence of the *Volkswagen* factors renders jurisdiction unreasonable, then the Constitution comes into play, and the fair play

standard may defeat jurisdiction.[1]  *Id.* at 477–78, 105 S.Ct. at 2184–85.

*Burger King*'s pronouncement, however strong, did not determine the outcome in that case.  In *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), however, application of certain factors of the fair play standard defeated jurisdiction independently of considerations about the defendant's contacts with the forum state.  *Id.* at 114–16, 107 S.Ct. at 1034–36.  The Court decided that a Taiwanese company which had been sued and had settled with a California plaintiff could not seek indemnification from a Japanese defendant in a California court.  Specifically, the Court was influenced by: (1) the procedural and substantive policies of other nations whose interests were affected by the assertion of the state's jurisdiction; (2) the slight interests of the Taiwanese plaintiff and the California forum in the state's assertion of jurisdiction over the defendant; and (3) the severe burden on the Japanese defendant. *Id.*  Justice Brennan noted in his concurring opinion that the case presented one of those rare instances in which the fair play standard defeated jurisdiction even where the defendant had purposefully availed himself of the forum.  *Id.* at 116, 107 S.Ct. at 1035.  The fair play standard had achieved, at long last, the independent status and power of the contacts standard.  As Justice Stevens flatly stated, "An examination of minimum contacts is not always necessary to determine whether a state court's assertion of personal jurisdiction is constitutional."  *Id.* at 121, 107 S.Ct. at 1037.

## II.  FAIR PLAY IN THE ABSENCE OF FORUM NON CONVENIENS

In *Asahi,* the fair play standard acquired—and perhaps eclipsed—the force of the minimum contacts standard.  It is now clear that considerations of fair play may defeat jurisdiction even where a defendant has minimum contacts with the forum.

Should the same considerations be allowed to defeat the contacts that exist between defendant and forum in the case before us today?  To arrive at the answer, I invite a comparison between *Asahi* and this case.

In *Asahi,* a foreign plaintiff sought to enforce his claim against a foreign defendant in a California court.  The United States Supreme Court considered both of the standards derived from *Shoe,* dividing on the question whether the foreign defendant had sufficient contacts with California.  Nevertheless, the fair play standard of the due process clause, standing alone, foreclosed the plaintiff's claim and defeated the court's jurisdiction.  In the case before us today, a foreign plaintiff seeks to enforce his claim against a Texas defendant.  These defendants may not defeat jurisdiction based on a contacts analysis, for they have many contacts with our state.  The question remains, however, whether they are entitled to the same inquiries into fair play afforded the foreign defendant in *Asahi.*  If the answer is no, then the due process clause produces a lopsided and incorrect result:  lopsided because it protects a foreign defendant from a foreign plaintiff but leaves a United States citizen exposed to liability from a similar source, incorrect because the Constitution does not afford greater protection to foreign plaintiffs than to American citizens.  The answer, therefore, must logically be yes.  Where the assertion of jurisdiction threatens notions of fair play and substantial justice, then the elements of fair play must be investigated, irrespective of the contacts of the defendant.

## III.  ABOLITION OF FORUM NON CONVENIENS—EFFECTS ON THE FAIR PLAY ANALYSIS

I do not lightly suggest that the due process clause is, or should be, implicated in the case before this court.  I am aware of Justice Brennan's observation in *Burger King* that, in most cases, fair play "considerations usually may be accommodated

---

1.  Texas has expressly adopted *Burger King*'s fair play analysis.  *See Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 664 (1987); *cert.* *denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 986 (1988).

through means short of finding jurisdiction unreasonable." *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. It is my belief, however, that in the absence of *forum non conveniens*, many of those accommodations cannot be made.

Consider, for example, the *Burger King* Court's statement that a defendant claiming inconvenience may seek a change of venue. *Id.* at 477, 105 S.Ct. at 2184. While transfer of venue is feasible only within a unitary judicial system, a defendant outside the system who claims substantial inconvenience may normally move for dismissal under the common-law doctrine of *forum non conveniens*. *Forum non conveniens* may indeed be a more appropriate vehicle than application of a due process analysis for taking account of defendant inconvenience. *See* Stravitz, *Sayonara to Minimum Contacts: Asahi Metal Industry Co. v. Superior Court*, 39 S.C.L.Rev. 729, 808–09 (1988). In this case, however, *forum non conveniens* has been abolished. No vehicle exists to take account of a defendant's inconvenience. Consequently, the common law factors that once comprised the *forum non conveniens* analysis, factors that addressed complaints of inconvenience through a "means short of finding jurisdiction unreasonable," must now be raised to the level of a constitutional inquiry and subsumed within the fair play standard of the due process jurisdictional analysis.

## IV. OTHER CONCERNS

Other considerations in this case implicate the fair play standard. Although they are too numerous and complex for analysis here, they are important enough to warrant the attention of the court and the litigants. First, we are inviting into our courts disputes that may involve more substantial connections to foreign countries than to our own. Should we not stop to consider, as the *Asahi* court did, the possible effects of extending our laws beyond the shores of the United States? *See generally* Born, *Reflections on Judicial Jurisdiction in International Cases*, 17 Ga.J.Int'l & Comp.L. 1 (1987).

Second, there are in this case unresolved choice of law questions that, once resolved, may diminish the interest of this state in this litigation. The plaintiffs proceed as though obtaining jurisdiction in Texas automatically confers upon them the benefits of Texas substantive law as well. As Justice Brennan made clear in *Burger King* when he urged consideration of choice of law principles as a "means short of finding jurisdiction unreasonable," such a result does not automatically follow. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. On remand, the parties must debate choice of law before the trial court, which must again make a determination of the forum's contacts with the plaintiff and the litigation. There is a strong possibility that a choice of law analysis will result in the application of Costa Rican law. If so, what then is Texas' interest in adjudicating a foreign claim by foreign plaintiffs? The *Volkswagen* factors are clear, and they include the forum state's interest in adjudicating the dispute as well as the interstate judicial system's interest in obtaining the most effective resolution of controversies. *Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564. Yet the majority fails to recognize the impact of choice of law on the fair play standard. This impact should be given more careful consideration.

Finally, and most important, I have questions concerning the propriety of exercising jurisdiction over plaintiffs whose relationship to this state is so attenuated. Although the United States Supreme Court's position on plaintiff-forum relationship has been uncertain, the law indicates a growing concern with that relationship. In two earlier cases, the Court rejected the notion that a plaintiff's contacts with the forum should be properly included in the due process analysis. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Burger King*, however, the Court included the plaintiff's interest in obtaining relief as one of the factors in the fair play analysis. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. And in *Asahi*,

the Court attached importance to the lack of a relationship between the plaintiff and California, stating that "[b]ecause the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished." *Asahi*, 480 U.S. at 114, 107 S.Ct. at 1034.

It appears, therefore, that a plaintiff's relationship to the forum state constitutes a legitimate inquiry in the fair play analysis. Without a comprehensive record in this case, I decline to consider whether the plaintiffs are sufficiently connected with Texas such that their suit would not offend traditional notions of fair play and substantial justice. I believe, however, that the question ought to be investigated.[2]

## V. CONCLUSION

The due process test for in personam jurisdiction has developed to protect defendants from unreasonable and unfair assertions of judicial power. The dominant component of the test has concentrated on a defendant's contacts with the forum, but the test includes another component, the recurring question whether the assertion of jurisdiction comports with constitutional guarantees of fair play and substantial justice. Although questions whether the forum is appropriate often encompass considerations of fair play, the due process test has not developed answers to these questions. Indeed, there has been no need for the test to do so, for the common law doctrine of *forum non conveniens* has

bridged the gap between the due process test of jurisdiction and concerns about forum appropriateness. By abolishing the doctrine of *forum non conveniens*, the court shatters that bridge. The questions of fair play inherent in the *forum non conveniens* inquiry cannot now be answered unless they are answered within the context of the due process test for in personam jurisdiction.

HECHT, Justice, dissenting.

Today the Court decrees that citizens of a foreign nation, Costa Rica, who claim to have been injured in their own country have an absolute right to sue for money damages in Texas courts. This same invitation extends to the citizens of every nation which would allow a Texas resident to sue in its courts in the most unlikely event he should ever want to. Citizens of foreign nations injured in Texas may certainly sue here; in some cases, they may sue in Texas even though they were injured elsewhere. But for this Court to give aliens injured outside Texas an absolute right to sue in this state inflicts a blow upon the people of Texas, its employers and taxpayers, that is contrary to sound policy.

The United States does not give aliens unlimited access to its courts. Indeed, one federal district court in California[1] and two in Florida[2] have already dismissed essentially this same lawsuit which the Court now welcomes to Texas. No state has ever given aliens such unlimited admission to its

---

2. I also observe with interest that there may someday be a "means short of finding jurisdiction unreasonable" to answer the potential problem of foreign plaintiffs suing American defendants in American courts. Those means could come in the form of a federal law. In 1987, a bill was introduced in the House to amend the Judicial Code to provide specifically for removal to federal court actions commenced in state courts by foreign citizens against a United States citizen "for injury that was sustained outside the United States and relates to manufacture, purchase, sale, or use of a product outside the United States." *See* H.R. 3662, 100th Cong., 1st Sess., 133 CONG.REC. 10,785–86 (1987). In the 101st Congress, the bill was revised somewhat and has been reintroduced. *See* H.R. 3406, 101st Cong., 1st Sess., 135 CONG.REC. 1124 (1989).

1. *Aquilar v. Dow Chem. Co.*, No. 86–4753 JGD (C.D.Cal.1986), *cited in Cabalceta v. Standard Fruit Co.*, 667 F.Supp. 833, 837, *aff'd in part and rev'd in part on other grounds*, 883 F.2d 1553 (11th Cir.1989).

2. *Sibaja v. Dow Chemical Co.*, 757 F.2d 1215 (11th Cir.), *cert. denied*, 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985); *Cabalceta v. Standard Fruit Co.*, 667 F.Supp. 833 (S.D.Fla.1987), *aff'd in part and rev'd in part on other grounds*, 883 F.2d 1553 (11th Cir.1989) (holding that if the district court had jurisdiction of the action removed from state court, its dismissal on the grounds of forum non conveniens was appropriate, and that if it did not, the action must be remanded to state court).

courts. The United States Supreme Court,[3] the District of Columbia,[4] and forty states [5] have all recognized what has come to be called the rule of forum non conveniens. Simply stated, the rule is that "[a] state will not exercise jurisdiction if it is a seriously inconvenient forum for the trial of the action provided that a more appropriate forum is available to the plaintiff." RE-STATEMENT (SECOND) OF CONFLICT OF LAWS § 84 (1971). The rule is founded in "con-siderations of fundamental fairness and sensible and effective judicial administra-tion." *Adkins v. Chicago, R.I. & Pac. R.R.,* 54 Ill.2d 511, 301 N.E.2d 729, 730 (1973). Until now, no state has ever reject-ed this rule.[6] This Court, however, does not even acknowledge the collective wisdom of the entire country.

To abolish the rule of forum non conve-niens in personal injury and death cases,

3. *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

4. *Mills v. Aetna Fire Underwriters Ins. Co.,* 511 A.2d 8 (D.C.1986).

5. *Crowson v. Sealaska Corp.,* 705 P.2d 905 (Alas-ka 1985); *Avila v. Chamberlain,* 119 Ariz. 369, 580 P.2d 1223 (1978); *Running v. Southwest Freight Lines,* 227 Ark. 839, 303 S.W.2d 578 (1957); *Archibald v. Cinerama Hotels,* 15 Cal.3d 853, 126 Cal.Rptr. 811, 544 P.2d 947 (1976); *State v. District Court,* 635 P.2d 889 (Colo.1981); *Miller v. United Technologies Corp.,* 40 Conn. Supp. 457, 515 A.2d 390 (1986); *State Marine Lines v. Domingo,* 269 A.2d 223 (Del.1970); *Houston v. Caldwell,* 359 So.2d 858 (Fla.1978); *Allen v. Allen,* 64 Haw. 553, 645 P.2d 300 (1982); *Jones v. Searles Laboratories,* 93 Ill.2d 366, 67 Ill.Dec. 118, 444 N.E.2d 157 (1982); *McCracken v. Eli Lilly & Co.,* 494 N.E.2d 1289 (Ind.Ct.App. 1986); *Silversmith v. Kenosha Auto Transport,* 301 N.W.2d 725 (Iowa 1981); *Quillin v. Hesston Corp.,* 230 Kan. 591, 640 P.2d 1195 (1982); *Car-ter v. Netherton,* 302 S.W.2d 382 (Ky.1957); *Stewart v. Litchenberg,* 148 La. 195, 86 So. 734 (1920); *Foss v. Richards,* 126 Me. 419, 139 A. 313 (1927); *Texaco v. Vanden Bosche,* 242 Md. 334, 219 A.2d 80 (1966); *Joly v. Albert Laroque Lumber Ltd.,* 397 Mass. 43, 489 N.E.2d 698 (1986); *Anderson v. Great Lakes Dredge & Dock Co.,* 411 Mich. 619, 309 N.W.2d 539 (1981); *Johnson v. Chicago, Burlington & Quincy R.R.,* 243 Minn. 58, 66 N.W.2d 763 (1954); *Illinois Cent. Rd. Co. v. Moore,* 215 So.2d 419 (Miss. 1968); *Besse v. Missouri Pacific R.R.,* 721 S.W.2d 740 (Mo.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987); *Qualley v. Chrysler Credit Corp.,* 191 Neb. 787, 217 N.W.2d 914 (1974); *Payne v. Eighth Jud. Dist. Court,* 97 Nev. 228, 626 P.2d 1278 (1981); *Van Dam v. Smit,* 101 N.H. 508, 148 A.2d 289 (1959); *Gore v. United States Steel Corp.,* 15 N.J. 301, 104 A.2d 670, *cert. denied,* 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954); *McLam v. McLam,* 85 N.M. 196, 510 P.2d 914 (1973); *Islamic Republic of Iran v. Pahlavi,* 62 N.Y.2d 474, 478 N.Y.S.2d 597, 467 N.E.2d 245 (1984); *Motor Inn Mgmt., Inc. v. Irvin-Fuller Dev. Co.,* 46 N.C.App. 707, 266 S.E.2d 368, *review denied,* 301 N.C. 93, 273 S.E.2d 299 (1980); N.D.R.CIV.PRO. 4(b)(5);

*Chambers v. Merrell-Dow Pharm.,* 35 Ohio St.3d 123, 519 N.E.2d 370 (1988); *Groendyke Transp., Inc. v. Cook,* 594 P.2d 369 (Okla.1979); *Horner v. Pleasant Creek Mining Corp.,* 165 Or. 683, 107 P.2d 989 (1940); *Rini v. New York Cent. R.R. Co.,* 429 Pa. 235, 240 A.2d 372 (1968); *Braten Apparel Corp. v. Bankers Trust Co.,* 273 S.C. 663, 259 S.E.2d 110 (1979); *Zurick v. Inman,* 221 Tenn. 393, 426 S.W.2d 767 (1968); *Kish v. Wright,* 562 P.2d 625 (Utah 1977); *Burrington v. Ashland Oil Co.,* 134 Vt. 211, 356 A.2d 506 (1976); *Werner v. Werner,* 84 Wash.2d 360, 526 P.2d 370 (1974); WIS.STAT.ANN. § 262.19.

6. Of the nine states that have not recognized the rule of forum non conveniens, none have reject-ed it absolutely as the Court does today. As discussed below, Alabama did reject the rule of forum non conveniens at one time but has since recognized it by statute. Montana has refused to apply the rule of forum non conveniens in actions under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 (1986), but has expressly reserved the issue of the applicability of the rule to other actions. *Labella v. Burlington North-ern, Inc.,* 182 Mont. 202, 595 P.2d 1184, 1187 (1979). An Idaho appellate court has suggested that the rule would apply in appropriate cases. *Nelson v. Worldwide Lease, Inc.,* 110 Idaho 369, 716 P.2d 513, 518 n. 1 (App.1986). Georgia, like Montana, would not apply the rule in FELA cases, *see Brown v. Seaboard Coast Lines R.R.,* 229 Ga. 481, 192 S.E.2d 382, 383 (1972), but has suggested that it might apply in other cases, *Smith v. Board of Regents,* 165 Ga.App. 565, 302 S.E.2d 124, 125 (1983). West Virginia also de-clines to apply the rule in FELA cases, but has not expressly ruled on its application in other contexts. *Gardner v. Norfolk and W. Ry. Co.,* — W.Va. —, 372 S.E.2d 786 (W.Va.1988). Connecticut has applied forum non conveniens factors in a case without referring to the rule by name. *Miller v. United Technologies Corp.,* 40 Conn.Supp. 457, 515 A.2d 390 (1986). Wyoming has not resolved the issue. *Booth v. Magee Carpet Co.,* 548 P.2d 1252, 1255 n. 2 (Wyo.1976). Alaska has refused to reject one case on grounds of forum non conveniens, but did not absolutely reject the rule in all cases. *Crowson v. Sealaska Corp.,* 705 P.2d 905 (Alaska 1985). Virginia, Rhode Island and South Dakota do not appear to have considered application of the rule.

the Court relies upon no authority other than a 1913 statute, which it never analyzes, and one sentence from a 1932 court of appeals decision. Neither of these authorities is sufficient support for the Court's sweeping decision, as I demonstrate below. Furthermore, and equally troubling, the Court attempts no response to the petitioners' very substantial arguments that the rule of forum non conveniens does and should apply in Texas.

## I

Section 71.031 of the Texas Civil Practice and Remedies Code states:

(a) An action for damages for the death or personal injury of a citizen of this state, of the United States, or of a foreign country may be enforced in the courts of this state, although the wrongful act, neglect, or default causing the death or injury takes place in a foreign state or country, if:

(1) a law of the foreign state or country or of this state gives a right to maintain an action for damages for the death or injury;

(2) the action is begun in this state within the time provided by the laws of this state for beginning the action; and

(3) in the case of a citizen of a foreign country, the country has equal treaty rights with the United States on behalf of its citizens.

(b) All matters pertaining to procedure in the prosecution or maintenance of the action in the courts of this state are governed by the law of this state.

(c) The court shall apply the rules of substantive law that are appropriate under the facts of the case.

This statute is a nonsubstantive recodification of its predecessor, article 4678 of the Texas Revised Civil Statutes, which the trial court applied. As it affects this case, the statute has not been changed materially since it was first passed in 1913 and amended in 1917.[7]

The plain language of this statute is permissive: the actions described *"may* be enforced in the courts of this state". The statute thus prohibits dismissal of an action within its ambit solely because plaintiffs reside or the action arose outside Texas. The Legislature has plainly opened the door to such actions; but the Court tears the door off its hinges. Not only does the statute allow foreign actions, the Court says, it mandates them. The Court would be correct if the statute stated that the actions it describes *"shall* be enforced in the courts of this state". But it does not say so. The statute does not create an absolute right to bring a personal injury action in Texas no matter how little it has to do with this state, how inconvenient it is to the parties, and how burdensome it is to the courts and the people of Texas who must pay for them. The statute certainly does not explicitly revoke the rule of forum non conveniens.

The Court's analysis of the statute consists of quoting it. The Court then argues with JUSTICE GONZALEZ's dissent about whether the rule of forum non conveniens existed in Texas prior to 1913, when the statute was first enacted. The point of this argument appears to be that the Legislature *could have* abolished the rule in 1913

---

**7.** The original act provided "[t]hat whenever the death or personal injury of a citizen of this State or of a country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by a wrongful act, neglect or default in any State, for which a right to maintain an action and recover damages in respect thereof is given by a statute or by law of such State, territory or foreign country, such right of action may be enforced in the courts of the United States, or in the courts of this State, within the time prescribed for the commencement of such action by the statute of this State, and the law of the former shall control in the

maintenance of such action in all matters [pertaining] to procedure." Act of Apr. 8, 1913, ch. 161, 1913 Tex.Gen.Laws 338–339, *repealed by* Revised Statutes, § 2, 1925 Tex.Rev.Civ.Stat. 2419.

This act was amended in 1917 to apply to citizens of the United States as well as of this State and foreign countries, and to clarify that the actionable injury could occur not only in another state but also in a foreign country. Act of March 30, 1917, ch. 156, 1917 Tex.Gen.Laws 365, *repealed by* Revised Statutes, § 2, 1925 Tex. Rev.Civ.Stat. 2419.

because it had been recognized earlier. This argument is at best inconclusive. The Legislature could have made the right to bring actions under the 1913 statute absolute regardless of whether anyone had ever heard of the principles of forum non conveniens, by that name or any other. The issue is not what the Legislature *could have done*, but what it *did do*.

Just as the Court ignores other states' acknowledgment of the rule of forum non conveniens, it ignores other states' construction of similar statutes. The supreme courts of other states with statutes similar to section 71.031 containing the term "may" have held those statutes to be permissive and have applied the rule of forum non conveniens. For instance, the Kansas statute provides:

> Whenever a cause of action has accrued under or by virtue of the laws of any other state or territory, such cause of action *may* be sued upon in any of the courts of this state by the person or persons who are authorized to bring and maintain an action thereon in the state or territory where the same arose.

KAN.STAT.ANN. § 60–217(b) (1983) (emphasis added). Despite terms nearly identical to the Texas statute, Kansas applies forum non conveniens. *Gonzales v. Atchison, T. & S.F. Ry.*, 189 Kan. 689, 371 P.2d 193 (1962). Similarly, the Iowa statute provides:

> An action *may* be brought against any railway corporation, the owner of stages, or other line of coaches or cars ... or persons operating the same, in any county through which such road or line passes or is operated.

IOWA CODE § 616.8 (1950) (emphasis added). Despite this statute, however, Iowa applies the doctrine of forum non conveniens. *Silversmith v. Kenosha Auto Transp.*, 301 N.W.2d 725, 727 (Iowa 1981).

By comparison, Alabama had a specific mandatory statutory provision which stated:

> Whenever, either by common law or the statutes of another state, a claim either upon contract or in tort has arisen in such other state against any person or

corporation, such cause of action *shall* be enforceable in the courts of this state....

ALA.CODE § 6–5–430 (1975) (emphasis added). While this statute was effective, the Alabama Supreme Court construed this statute to preclude application of the rule of forum non conveniens. *Central of Ga. Ry. v. Phillips*, 286 Ala. 365, 240 So.2d 118 (1970). The use of the mandatory verb "shall" in the Alabama statute stood in stark contrast to the use of the discretionary verb "may" in the Texas, Kansas, and Iowa statutes. In 1987 the Alabama Legislature amended its statute to recognize expressly the rule of forum non conveniens:

> Whenever, either by common law or the statutes of another state or of the United States, a claim either upon contract or in tort has arisen outside this state against any person or corporation, such claim *may* be enforceable in the courts of this state ... provided, however, the courts of this state shall apply the doctrine of forum non conveniens in determining whether to accept or decline to take jurisdiction of an action based upon such claim originating outside this state.

ALA.CODE § 6–5–430 (1987) (emphasis added). When Alabama's legislature chose to change its law to ensure recognition of the rule of forum non conveniens, it changed "shall be enforceable" to "may be enforceable". The Texas Legislature's use of "may" in the same context is no less permissive and no more mandatory.

The language of section 71.031 simply does not support the Court's holding. The very most the Court can say is that the statute is unclear. If there were some ambiguity in the statute, surely the Court should suggest some rationale for resolving the ambiguity the way it has. The sole authority the Court offers in support of its holding is *Allen v. Bass*, 47 S.W.2d 426 (Tex.Civ.App.—El Paso 1932, writ ref'd).

## II

*Allen v. Bass* was a suit by one New Mexico resident against another for personal injuries sustained in an automobile accident which occurred in New Mexico. The

trial court dismissed the action as "an improper interference with the jurisdiction that should and ought to be exercised by the State of New Mexico". *Id.* Citing the 1913 and 1917 versions of article 4678, predecessors to current section 71.031, the court of appeals reversed, saying: "we think [the plaintiff] has an absolute right to maintain the present action in the courts of this state ..., and the courts of this state are left without any discretion in the matter." 47 S.W.2d at 427. The court then added:

> We have concluded that article 4678 opens the courts of this state *to citizens of a neighboring state* and gives to them an absolute right to maintain a transitory action of the present nature and to try their cases in the courts of this state.

*Id.* (emphasis added). One might wonder whether the court of appeals in 1932 ever envisioned that one unnecessarily broad sentence in its opinion would someday be authority for compelling Texas courts to hear plaintiffs and actions from around the world. Nevertheless, *Allen v. Bass,* even if myopic, is clear and, as the Court concludes, indistinguishable on any principled ground.

*Allen v. Bass* should not control this case. In over half a century, that case has never been followed by another court. Two courts of appeals have expressly rejected it as authority. *McNutt v. Teledyne Indus., Inc.,* 693 S.W.2d 666, 668 (Tex.App.—Dallas 1985, writ dism'd); *Forcum–Dean Co. v. Missouri Pac. R.R.,* 341 S.W.2d 464,

465–466 (Tex.Civ.App.—San Antonio 1960, writ dism'd). More importantly, this Court as recently as six years ago stated: "the applicability of forum non conveniens to an article 4678 cause of action is an open question. *Flaiz v. Moore,* 359 S.W.2d 872, 876 (Tex.1962)." *Couch v. Chevron Int'l Co.,* 682 S.W.2d 534, 535 (Tex.1984). Thus, *Couch* and *Flaiz* unmistakably disapproved the broad language of *Allen v. Bass* without even bothering to cite it. The Court does not mention, explain or attempt to distinguish any of these authorities which cast grave doubt upon the sole basis of its holding.[8]

*Allen v. Bass* is far too feeble a precedent to support the Court's expansive holding. That case is simply an aberration in the jurisprudence of not only the state but the country, and I would overrule it.

### III

The dearth of authority for the Court's unprecedented holding is disturbing. Far more disconcerting, however, is the Court's silence as to why the rule of forum non conveniens should be abolished in personal injury and death cases, either by the Legislature or by the Court. If the Legislature did abolish the rule of forum non conveniens by statute in 1913, what does the Court think the Legislature expected to accomplish for the people of this state?[9] The benefit to the plaintiffs in suing in Texas should be obvious: more money, as counsel was candid enough to admit in oral argument.[10] This advantage to suing in

---

**8.** Justice Doggett's concurring opinion objects that this analysis does not give proper deference to the doctrine of stare decisis. Justice Doggett did not defend the doctrine quite so vigorously in his very first opinion as a member of this Court, which overruled two prior decisions of this Court. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989) (overruling, in part, *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105 (Tex. 1984), and *Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80 (Tex.1976). Stare decisis cannot save *Allen v. Bass.* Its language simply cannot coexist consistently with *Couch.*

**9.** The issue for the Court is not whether the Legislature *should* have abolished forum non conveniens, but whether it *did.* If it did, it surely must be presumed to have acted in the

best interests of the people of Texas. The purpose of examining the public policies which support the rule of forum non conveniens is not to argue for retention of the rule but to show that the Legislature would not be motivated to abolish the rule.

**10.** It is equally plain to me that defendants want to be sued in Costa Rica rather than Texas because they expect that their exposure will be less there than here. However, it also seems plain to me that the Legislature would want to protect the citizens of this state, its constituents, from greater exposure to liability than they would face in the country in which the alleged wrong was committed. This would be incentive for the Legislature *not* to abolish the rule of forum non conveniens.

American courts has not escaped international notice. England's Lord Denning, for example, has observed, "As a moth is drawn to the light, so is a litigant drawn to the United States. If he can only get his case into their courts, he stands to win a fortune." *Smith Kline & French Laboratories Ltd. v. Bloch*, (1983) 2 All E.R. 72, 74, *in* Note, *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond "Reyno"*, 64 Texas L.Rev. 193, 197–8, n. 28 (1985).

But what purpose beneficial to the people of Texas is served by clogging the already burdened dockets of the state's courts with cases which arose around the world and which have nothing to do with this state except that the defendant can be served with citation here? Why, most of all, should Texas be the only state in the country, perhaps the only jurisdiction on earth, possibly the only one in history, to offer to try personal injury cases from around the world? Do Texas taxpayers want to pay extra for judges and clerks and courthouses and personnel to handle foreign litigation? If they do not mind the expense, do they not care that these foreign cases will delay their own cases being heard? As the courthouse for the world, will Texas entice employers to move here, or people to do business here, or even anyone to visit? What advantage for Texas does the Court see, or what advantage does it think the Legislature envisioned, that no other jurisdiction has ever seen, in abolishing the rule of forum non conveniens for personal injury and death cases? Who

gains? A few lawyers, obviously. But who else? If the Court has good answers to these questions, why does it not say so in its opinion? If there are no good answers, then what the Court does today is very pernicious for the state.[11]

The rule of forum non conveniens, properly used, does not prohibit a court from entertaining a case it ought to hear. Rather, it protects courts from being compelled to hear cases when doing so would be fundamentally unfair to the defendants or the public or both. The rule recognizes that there are unusual cases which a court has power to hear but which it should nevertheless decline. The rule thus provides some play in the otherwise relatively rigid jurisdictional and venue joints of the judicial system. The factors to be considered in determining the application of the rule were set forth at length by the United States Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947):

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The

---

**11.** JUSTICE DOGGETT's concurring opinion undertakes to answer these questions that the Court ignores. It suggests that there are essentially two policy reasons to abolish the rule of forum non conveniens: to assure that injured plaintiffs can recover fully, and to assure that American corporations will be fully punished for their misdeeds abroad. Neither reason is sufficient. If the defendants in this case were Costa Rican corporations which plaintiffs could sue only in Costa Rica, plaintiffs would be limited to whatever recovery they could obtain in Costa Rican courts. The concurring opinion has not explained why Costa Rican plaintiffs who claim to have been injured by American corporations are unjustly treated if they are required to sue in their own country where they could only sue if they had been injured by Costa Rican corpora-

tions. In other words, why are Costa Ricans injured by an American defendant entitled to any greater recovery than Costa Ricans injured by a Costa Rican defendant, or a Libyan defendant, or an Iranian defendant? Moreover, the concurring opinion does not explain why the American justice system should undertake to punish American corporations more severely for their actions in a foreign country than that country does. If the alleged conduct of the defendants in this case is so egregious, why has Costa Rica not chosen to afford its own citizens the recovery they seek in Texas? One wonders how receptive Costa Rican courts would be to the pleas of American plaintiffs against Costa Rican citizens for recovery of all the damages that might be available in Texas, or anywhere else for that matter.

court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

The relative importance of private factors as compared with public factors may have shifted since *Gulf Oil*. Ease of travel and communication, availability of evidence by videotape and facsimile transmission, and other technological advances have reduced the significance of some private inconvenience factors. The public factors, however, deserve the same consideration now as when *Gulf Oil* was written.

The balancing of public and private considerations in applying the rule of forum non conveniens is primarily the responsibility of the trial court. "The forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all the relevant public and private interest factors, and where its

balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (op. by Marshall, J., citing *Gilbert*, 330 U.S. at 511–12, 67 S.Ct. at 844–45, and *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 531, 67 S.Ct. 828, 835, 91 L.Ed. 1067 (1947)). To allow for meaningful appellate review, however, the trial judge must enunciate the factors considered and the reasons for the balance struck. The trial court in the present case did not provide this essential basis for its decision to dismiss this case. I cannot determine from the record before us whether the trial court was correct in dismissing this case on the grounds of forum non conveniens. Consequently, I would reverse the trial court's dismissal of the case and remand to that court for further consideration in light of this opinion. I would, however, reverse the judgment of the court of appeals to the extent that it precludes the possibility of dismissal after proper application of the rule of forum non conveniens. I would hold, not that the rule of forum non conveniens should be applied in *this* case, but only that it can be applied in a *proper* case. I would intimate no decision on whether this would be shown to be a proper case after further proceedings in the trial court.

The plaintiffs in this case are certainly entitled to justice. But so are the people of Texas. And it may well be that justice for both groups requires that these plaintiffs pursue their remedies fully in Costa Rica, their home. I therefore dissent.

## ON MOTION FOR REHEARING

PHILLIPS, Chief Justice, dissenting.

During the pendency of the motion for rehearing in this cause, this court made a decision which I believe conflicts squarely with our opinion here. Our amendment of Texas Rule of Appellate Procedure 140, in my view, is based on a statutory interpretation which is incompatible with our construction of Section 71.031 of the Texas Civil Practice and Remedies Code.

Rule 140, effective September 1, 1990, will provide that the Supreme Court may decline to exercise jurisdiction over a direct appeal for several reasons, including instances where "the case is not of such importance to the jurisprudence of the state that a direct appeal should be allowed." Tex.R.App.P. 140(b) (eff. Sept. 1, 1990). Although this rule and its predecessor rule of civil procedure (Tex.R.Civ.P. 499a) have been in existence since 1943, this court has never before, either by rule or opinion, asserted that its jurisdiction over direct appeals was discretionary. *See generally* Wicker, *Direct Appeals to the Supreme Court*, 32 Texas Practice—Civil Trial and Appellate Procedure 97–102 (1985). The statute authorizing such appeals is, like the statute authorizing wrongful death actions, couched in terms of what a party "may" do. Section 22.001(c) of the Texas Government Code (formerly Article 1738a, Tex.Rev.Civ.Stat.), provides:

> An appeal *may be taken* directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state. It is the duty of the supreme court to prescribe the necessary rules of procedure to be followed in perfecting the appeal.[1]

(Emphasis added).

Our posture is thus that a district judge *may not* decline to exercise jurisdiction on common law procedural grounds because a plaintiff who "may" bring an action under Section 71.031 of the Texas Civil Practice and Remedies Code has the absolute right to select the forum. On the other hand, this court *may* decline to exercise jurisdiction in a direct appeal on purely discretionary grounds, even though Section 22.001 of the Texas Government Code provides that an appeal "may be taken" under certain conditions. Is there a principled rationale for this distinction? I can find none. If "may" is mandatory in one instance, it should be mandatory in the other. Is this court entitled to an exemption from statutory mandates because of its importance,

its superior wisdom, or its crowded docket? Or does legislative direction mean one thing to this court in March, something else in April, and back again in May, reducing our decisions, in Justice Roberts' lament, to nothing but "a restricted railroad ticket, good for this day and train only"? *Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987, 1000 (1944) (Roberts, J., dissenting).

For this additional reason, I would grant petitioners' motion for rehearing.

GONZALEZ, COOK and HECHT, JJ., join in this dissenting opinion.

---

1. This statute is authorized by Article V, section 3–b of the Texas Constitution.